Adam Sipple (SBN 20557)
Rose Godinez (SBN 25925)
ACLU Foundation of Nebraska, Inc.
134 S. 13th St. #1010
Lincoln, NE 68508
T: (402) 476-8091
*ajsipple@aclunebraska.org*
*rgodinez@aclunebraska.org*

Maren Lynn Chaloupka (SBN 20864)
Chaloupka Holyoke Snyder Chaloupka
& Longoria, P.C., L.L.O.
P.O. Box 2424
Scottsbluff, NE 69363-2424
T: (308) 635-5000
F: (308) 635-8000
*mlc@chhsclaw.net*

Spencer Amdur**
Julie Veroff**
ACLU Foundation
39 Drumm Street
San Francisco, CA 94111
T: (415) 343-0770
F: (415) 395-0950
*samdur@aclu.org*
*jveroff@aclu.org*

Lee Gelernt**
Noor Zafar**
ACLU Foundation
125 Broad Street, 18th Floor
New York, NY 10004
T: (212) 549-2660
F: (212) 549-2654
*lgelernt@aclu.org*
*nzafar@aclu.org*

*Attorneys for Plaintiffs*                    **pro hac vice application forthcoming

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA
## LINCOLN DIVISION

| | |
|---|---|
| Alma*; Isabel*; Antonio*; and Daniel J. Leonard, *Plaintiffs*, v. Noah's Ark Processors, LLC *Defendant*. | Case No.: **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DESIGNATION OF PLACE OF TRIAL** |

\* Proceeding under pseudonym

## INTRODUCTION

1.      The COVID-19 pandemic has killed more than 250,000 people and sickened millions more in the United States.  The impact of the pandemic, however, has not been felt equally.

2.      Workers at meatpacking plants have been hit harder than almost any other industry.  Tens of thousands of meatpacking workers have become infected in major outbreaks at hundreds of plants across the country.  The outbreaks have spread among workers' families, neighborhoods, and towns, upending entire communities.

3.      Despite these large clusters throughout the industry, some companies have been slow to adopt common-sense protections—protections that doctors, researchers, and public-health officials agree are necessary to prevent further spikes—like physical distancing, testing, masks, and sick leave.  As a result of these failures, major meatpacking outbreaks have continued to occur throughout the pandemic.  Companies that do not implement these protections are exposing their workers and the surrounding community to an enormous and continuing risk.

4.      Defendant Noah's Ark Processors, which owns and operates a beef processing plant in Hastings, Nebraska, stands out for its refusal to take reasonable and obvious precautions to protect its workers and the community from a new surge of COVID-19 cases.  Despite the consensus that has emerged around these precautions, Noah's Ark has failed to implement them, even after its workers suffered a major wave of infections in April and May.

5.      Noah's Ark ("the plant") has refused to make any effort to physically distance workers from one another while they are in the plant.  Every day, they stand shoulder to shoulder for hours at a time on the processing lines, and they sit crowded together in a small windowless cafeteria where they cannot wear masks while eating.

6.      Noah's Ark does not promptly replace workers' masks when they become soiled with blood, fat, and sweat, forcing workers to leave part or all of their faces uncovered, even though they are inches from each other throughout their shifts.

7.      The plant does not offer adequate sick leave to ensure that sick workers can stay home.  It has pressured sick people to work, allowed others to keep working despite symptoms, and refused to pay many who have stayed home because of symptoms.  It has not posted or announced any sick-leave policies to its workers.

8.      On top of everything else, Noah's Ark is not providing any onsite testing.  If and when there is another surge in cases, the plant and its workers will once again have no idea until it is too late.

9.      All of these protections—distancing, masks, sick leave, testing—are basic and eminently feasible.  Other plants are providing them.  While other protections are also desirable, these four are non-negotiable, especially at a crowded indoor workplace like Noah's Ark.  At this point in the pandemic, there is no excuse for failing to implement them.

10.      By forcing its employees to work in these dangerous conditions, Noah's Ark is putting them at enormous risk of becoming infected with COVID-19 and transmitting it to their families and communities.  That risk is growing dramatically as winter and flu season approach, when the CDC Director and others have warned that major new clusters are likely.

11.      The plaintiffs—recent Noah's Ark workers and members of the surrounding community—are therefore seeking an order that the plant implement these four most basic practices.  The plant's continuing failure constitutes a public nuisance, violates its common-law duty to provide a reasonably safe workplace, and violates the Families First Coronavirus Response Act.  These violations can be remedied by this Court.  Other courts have recently issued similar orders against employers that lacked basic protections.

12.     Plaintiffs have no other meaningful avenue for redress.  Noah's Ark has refused to make these changes despite multiple requests from workers.  State and local officials have taken no action to ensure adequate health protections at the plant.  The Occupational Safety and Health Administration ("OSHA") has not ordered any changes at the plant for months despite receiving multiple complaints, and has declined to require any particular safety practices during the pandemic.

13.     Without these protections, workers and others in the community face imminent and irreparable harm.  Plaintiffs therefore bring this action seeking declaratory and injunctive relief.

## JURISDICTION AND VENUE

14.     This Court has federal question jurisdiction, 28 U.S.C. § 1331, and pendent jurisdiction, 28 U.S.C. § 1367.  The Court also has subject matter jurisdiction under 28 U.S.C. § 1332.  Each Plaintiff is a resident of Nebraska.  Defendant is a limited liability corporation and no member is a citizen of Nebraska.  The amount in controversy exceeds $75,000.

15.     Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## PARTIES

16.     Plaintiff Alma[1] is a recent employee at the Noah's Ark plant and lives in Grand Island, Nebraska.  She worked at Noah's Ark until this Fall, when she quit because of poor working conditions.  She remains in close touch with workers at the plant.

17.     Plaintiff Isabel worked at Noah's Ark until late this Summer.  She lives in Grand Island and remains in close touch with workers at the plant.

---

[1] Alma, Isabel, and Antonio are pseudonyms to protect Plaintiffs' identities.  A motion to proceed under pseudonym is being filed along with this Complaint.

18.     Plaintiff Antonio worked at the Noah's Ark plant until this Fall.  He lives in Grand Island and remains in close touch with workers at the plant.

19.     Plaintiff Daniel J. Leonard is a doctor in Hastings, Nebraska, and owns a pediatrics practice.  He treats the children of meatpacking workers and people infected with COVID-19.

20.     Defendant Noah's Ark Processors, LLC, owns and operates a meatpacking plant in Hastings, Nebraska.  The LLC's members are citizens of New York, Wyoming, and Colorado. No member of the LLC is a citizen of Nebraska.

## BACKGROUND

### Hundreds of Meatpacking Plants, Including Noah's Ark, Have Had Serious Outbreaks

21.     The COVID-19 pandemic has devastated people across the country, but its burden has been especially great on meatpacking workers and their communities.

22.     Beginning in April 2020, meatpacking plants began experiencing huge spikes in COVID-19 cases.  Workers at hundreds of plants have experienced at least one spike, many of which have been enormous.[2]  A Smithfield plant in South Dakota became the country's single biggest hotspot in late April, with over a thousand cases.[3]  In Nebraska, 786 workers at a Tyson beef plant in Dakota City were infected in May.  That plant's outbreak turned the surrounding

---

[2] Leah Douglas, *Mapping Covid-19 Outbreaks in the Food System*, Food & Env. Reporting Network (last updated Nov. 23, 2020), https://thefern.org/2020/04/mapping-covid-19-in-meat-and-food-processing-plants/; Sky Chadde, *Tracking COVID-19's Impact on Meatpacking Workers & Industry*, Midwest Ctr. for Investigative Reporting (last updated Nov. 23, 2020), https://investigatemidwest.org/2020/04/16/tracking-covid-19s-impact-on-meatpacking-workers-and-industry/.
[3] Caitlin Dickerson & Miriam Jordan, *South Dakota Meat Plant Is Now Country's Biggest Coronavirus Hot Spot*, N.Y. Times (May 4, 2020).

community into a hotspot, with the fourth highest infection rate in the country.[4]  Four other Nebraska plants have reported hundreds of cases each.

23.     The Noah's Ark plant in Hastings has had at least one spike so far.  In April and May, dozens of its workers became sick with COVID-19.  Managers initially told workers that they had to keep working despite their symptoms, but ultimately a number of workers had to stay home with severe infections.  At least one Noah's Ark worker died.  Following this outbreak, Adams County, where the plant is located, had a much higher rate of infection compared to nearby counties without a meatpacking plant.  So did neighboring Hall County, where many workers live and which also contains a major meatpacking plant.

24.     To date, at least 49,000 meatpacking workers have become infected with COVID-19, and at least 253 have died.  They are disproportionately low-income immigrants and people of color.

25.     These numbers, however, do not nearly capture the full extent of COVID-19 outbreaks at meatpacking plants.  The true numbers of infections and deaths remain unknown because, in recent months, many plants have stopped sharing that information with the public.[5]  In Nebraska, the Governor in May instructed local health departments to stop reporting which meatpacking plants were experiencing outbreaks.

26.     Despite this lack of transparency, the limited reporting shows that large meatpacking outbreaks have continued throughout the pandemic.  For instance, a poultry plant in

---

[4] Henry Cordes & Erin Duffy, *What Do New York City and a Nebraska Meatpacking Center Have in Common? They Rank Among U.S. Communities Hit Hardest by Coronavirus*, Omaha World-Herald (May 3, 2020).
[5] Leah Douglas, *Few States Release Data About COVID-19 in the Food System*, Food & Env. Reporting Network (Aug. 17, 2020) ("[N]one of the major meatpackers are regularly disclosing COVID-19 outbreaks or cases at their facilities."); Sky Chadde, *We've Been Tracking Meatpacking Plant Outbreaks. Not All Are Accounted For*, Midwest Ctr. for Investigative Reporting (Aug. 19, 2020).

Merced County, California was forced to close in September after reporting hundreds of cases and multiple deaths. In Kansas, six plants reported thousands of active cases as of September. Between June and October, major outbreaks have been reported in many states including North Carolina, Mississippi, Minnesota, Ohio, Kansas, Colorado, California, and Utah.

### Meatpacking Plants Are Uniquely Susceptible to Spreading COVID-19

27.     There is little doubt as to why meatpacking workers have so consistently faced these outbreaks, as hundreds of people work close together, indoors, for hours at a time. That is the most dangerous possible environment when faced with a highly contagious airborne virus. Without proper infection-control practices, continuing spikes are inevitable.

28.     The virus that causes COVID-19 spreads rapidly. It is primarily transmitted through the air when an infected person exhales liquid particles containing the virus when breathing, talking, sneezing, or coughing. People are contagious days before they have any symptoms.

29.     The risk of transmission is greatly increased by several factors: Physical proximity is the most important, because it allows the virus to travel through the air from one person to another. The amount of time in proximity matters too, because a longer exposure means that more virus will transfer. Indoor settings lead to faster transmission than outdoor. And the harder a person breathes, the more virus they exhale.

30.     Meatpacking plants maximize each of these factors. Workers stand shoulder to shoulder for hours at a time along the processing lines, which are conveyor belts that move carcasses and meat between workers. On the "kill floor," cows are stunned and killed, the skin and organs are removed, and the carcasses are processed for cold storage. After cold storage, the carcasses are sent to the "fabrication area," where workers take pieces of meat off the line,

perform cutting tasks, and return the meat to the line.  On the "packaging floor," meat is put in boxes, sealed, labeled, and placed in a freezer prior to shipment.

31.     In all three areas, workers are often placed so close together that their elbows are touching.  Everyone is breathing hard because the work is so physically demanding.  Shifts often last for more than 8 hours at a time.  Cafeterias and other common areas are similarly crowded, which is particularly dangerous because people must remove their masks to eat.

32.     At Noah's Ark, hundreds of workers are subjected to these conditions day after day, as explained in more detail below.

### Basic COVID-19 Protections Are Essential to Prevent Further Meatpacking Outbreaks

33.     In this setting, it is critical to implement meaningful protections like distancing, masks, sick leave, and testing.  There is widespread consensus—among scientists, doctors, public health officials, and other experts—that these practices are necessary to prevent rapid COVID-19 transmission in congregate settings like a meatpacking plant.  While additional precautions should be implemented as best practices, these four are essential to prevent further outbreaks at meatpacking plants.  The absence of any one of them is a severe hazard to workers and the surrounding community.

#### *Physical Distancing*

34.     Physical distancing is universally recognized as one of the most important ways to protect against COVID-19 transmission.  Distancing is critical because the virus travels through the air and is most likely to infect people who are close by.

35.     Researchers widely agree that at least six feet of distance is necessary to protect against transmission of the virus.  The World Health Organization, CDC, state health departments, the University of Nebraska Medical Center, and countless other institutions

7

recommend that people remain six feet apart in the workplace, schools, and anywhere else they might congregate.  State and federal guidance universally calls for the same thing.

36.     Spacing workers at least six feet—both on the production lines and in common areas like the cafeteria—is critical to prevent the spread of COVID-19 in meatpacking plants.  In its study of the nation's largest meatpacking outbreak, the CDC concluded that because the plant had not implemented physical distancing, lesser measures—like temperature checks, masks, and plastic barriers—failed to prevent the rapid spread of infection.

37.     Multiple states have issued rules requiring meatpacking plants to implement physical distancing.  Numerous plants have done so across the country.

### *Face Masks*

38.     Another key mitigation measure is providing workers with a face mask that fits over the nose and mouth and can be worn continuously throughout a shift.  To be effective, mask wearing must be universal.  When workers must remove or lower their masks for part of their shifts, they are breathing directly onto nearby workers.

39.     Meatpacking workers' masks quickly become soiled with blood, fat, and sweat. Soiled and wet masks do not allow the wearer to breathe, and so must be replaced immediately or else they will not provide any protection, because workers will have to remove them to avoid suffocation.

### *Sick Leave*

40.     It is critical that workers with COVID-19 symptoms stay home so they do not infect their co-workers.  This precaution is universally recognized in the rules and guidance that have been issued during the pandemic.  A workplace that allows or pressures sick people to keep working is exposing its other workers to an extraordinary risk of infection.

41.     To ensure that sick workers stay home, employers must clearly communicate to workers that if they have COVID-19 symptoms or test positive, they may not work but will be provided paid sick leave.  Workers must not be penalized for staying home sick.

42.     In recognition of the need for paid sick leave during the pandemic, Congress has required employers to pay sick leave for COVID-related absences, and to prominently post their sick-leave policies so that workers know they do not need to work while sick.  *See* Families First Coronavirus Response Act, Pub. L. No. 116-127 (Mar. 18, 2020), 29 U.S.C. § 2601 note; 85 Fed. Reg. 19327; 29 C.F.R. § 826.10 *et seq*.

### *Onsite Testing*

43.     In high-risk settings like meatpacking plants, widespread testing is necessary to identify case clusters before they spiral out of control.  Without a testing regime, a plant and its workers will have no idea that the virus is rapidly spreading until it is too late.

44.     The meatpacking industry has largely recognized the need for testing.  Multiple companies have announced onsite testing programs to catch spikes early.

45.     Effective programs test workers with COVID-19 symptoms, workers with close exposure to COVID-positive co-workers, and asymptomatic workers to identify burgeoning hotspots.  Testing asymptomatic workers is essential because of the prevalence of asymptomatic infection and transmission.

46.     Numerous private companies provide workplace testing services.  And now that thousands of workplaces and other institutions have instituted testing programs, there are numerous viable models for their design.

47.     Plants that have not implemented these protections have faced continuing outbreaks.  These outbreaks have persisted despite rudimentary practices like temperature checks and masks.

9

48.     As one example, between July and September, 392 employees at a Foster Farms plant in California were infected and eight workers died.  Although the plant had been providing masks, workstation dividers, and temperature checks, it had not implemented physical distancing or onsite testing.  The plant was ultimately forced to shut down and implement an onsite testing program.

### Noah's Ark Has Refused to Implement Basic COVID-19 Protections

49.     Noah's Ark employs 300-400 people.  It is the largest meatpacking plant in Hastings, Nebraska, a city that is home to about 25,000 people.

50.     The plant has committed a number of workplace safety violations in recent years. In 2019, OSHA fined the plant $182,926 after a worker suffered severe burns because of the plant's deficient safety practices.  In 2020, the Department of Labor's Wage and Hour Division fined the plant for failing to pay a worker COVID-related sick leave.  Other recent legal violations include a 2016 USDA citation and multiple recent contempt orders issued by federal district courts for the plant's refusal to let its workers meet with union representatives.[6]

51.     Noah's Ark has refused to take the most critical and basic steps to protect its workers from another large COVID-19 outbreak.  Its refusal to provide adequate distancing, masks, sick leave, and testing creates an unacceptable risk to its employees, their families, and the rest of the local community.  Individually and together, these failures constitute a public nuisance and breach the plant's duty to provide a reasonably safe workplace.  Its failure to communicate or provide adequate sick-leave policies violates the Families First Act.

---

[6] The same plant, under previous ownership, was issued a $195,100 fine by OSHA in 2012 after a worker died using the plant's machinery.

### *Physical Distancing*

52.     Noah's Ark has made no effort to ensure physical distancing within the plant. Instead, it forces workers to stand right next to each other on the processing lines, sometimes touching elbows and shoulders with their neighbors, and to crowd together in a small cafeteria and other common areas during lunch and breaks.

53.     Throughout the plant, workers stand within one to two feet of each other during their eight-hour shifts.

54.     On the kill floor, where the cows are stunned, killed, and processed for initial storage, workers are crowded together and the plant has not installed any barriers between workstations.  Workers on the kill floor spend most of their shift within 1-2 feet of their coworkers.

55.     On the fabrication floor, where meat is cut into smaller pieces, workers stand side by side along the processing lines for hours at a time.  Rather than provide any meaningful protection, the plant has only installed ineffective movable plastic sheets between some of the workstations on the fabrication floor.

56.     On the packaging floor, where meat is packed, labeled, and placed in a storage freezer, workers stand within one foot of each other at several packaging tables.  There are no barriers between them.

57.     There are numerous feasible ways for the plant to space workers at least 6 feet apart on the kill, fabrication, and packaging floors.  Other plants in Nebraska and around the country have done so to protect against further outbreaks during the pandemic, for instance by adding shifts, using excess line space, slowing the lines, or leaving every other workstation empty.  Noah's Ark has done none of this.

58.    Crowding is just as bad in the Noah's Ark cafeteria, where the plant has made no effort to distance workers.  Dozens of workers, and sometimes more than 100, fill a small windowless room, touching each other constantly as they sit together on benches, stand together in line for the microwaves, and squeeze past one another in the cafeteria's narrow passageways.

59.    The cafeteria is made even more dangerous by the fact that, despite the high level of crowding, workers must remove their masks to eat.  Noah's Ark has thus created a situation where, every day during their 30-minute lunch break, dozens or hundreds of workers are breathing and coughing directly onto each other, with no mask, often with less than one foot of space between them.

60.    The plant has placed plastic barriers on the cafeteria tables, but the sheets are movable and small, and do not extend past the table's edge, which means they do not separate people who are sitting side by side on the bench.  They also do not separate people walking around or standing at the microwave.  Throughout the pandemic, the sheets have often been ripped, broken, or missing.

61.    There are many feasible ways to decrease crowding in the cafeteria, which many other companies have done, such as scheduling multiple lunch shifts with fewer workers each, or expanding the cafeteria.  Noah's Ark has done neither of these things.  Instead, it recently *added* more tables in the cafeteria, which leads to further crowding.

62.    The plaintiffs and other workers have raised these issues with Noah's Ark managers, explaining that this widespread crowding is creating a major risk of infection.  The plant has refused to take any action.

### *Face Masks*

63.    Workers are unable to wear their masks throughout their shifts, because Noah's Ark does not promptly replace masks when they become wet or soiled.

12

64.     The plant gives each worker a paper mask when they start their shift.  But the masks very quickly become saturated with blood, sweat, and fat.  Workers cannot breathe with soiled masks, so they are forced to either wear the masks below their noses or remove them entirely.

65.     Noah's Ark is not promptly replacing soiled masks.  The nurse often runs out of masks, in which case workers cannot get new masks for the rest of their 8-hour shift.  And masks are not provided throughout the plant—only a single nurse has them.  Workers are not allowed to leave their workstations while the line is moving, so unless a co-worker can cross the plant to find the nurse, workers with soiled masks must continue without a mask until their next break.

66.     As a result, Noah's Ark has people working without masks for part of their shift almost every day.  This means they are breathing and coughing directly onto their neighbors, who are only a foot or two away.

### *Sick Leave*

67.     Throughout the pandemic, Noah's Ark has allowed or pressured workers to come to work even when they have clear COVID-19 symptoms.  In May, when the plant first became a hotspot, managers initially told many workers who reported symptoms that they would be fired if they missed a shift.

68.     In more recent months, workers report instances in which they and their co-workers have been either pressured or allowed by managers to keep working despite symptoms.  The plant has therefore kept workers on the lines despite clear symptoms of COVID-19, like fever, headache, achiness, cough, and sore throat.

69.     For instance, Plaintiff Isabel's temperature check showed a fever in July 2020, and the nurse told her she could keep working if she wanted to.  In September 2020, Plaintiff Alma spoke with a co-worker who had a fever but was told by a manager she would be fired if

13

she missed her shift.  After she missed one day because she was too weak to work, her manager was about to fire her but Alma helped convince the manager not to.  She worked with symptoms for weeks after.

70.     The plant has not distributed or posted any policies to workers to inform them about the requirements of the Families First Coronavirus Response Act, including that they will be paid sick leave if they have COVID-19 symptoms or test positive.  The plant also has not provided its workers with any information about how to file complaints with the Department of Labor about violations of the Families First Act.  The plant's failure to post this information has interfered with its employees' right to take sick leave.

71.     While the nurse sometimes tells workers to find a test when they show a high fever, the plant does not arrange or pay for the test.

72.     Given the lack of clear sick-leave policies, and the many recent episodes in which sick people have been kept at work, the widespread understanding among the workers is that they must keep working even if they have symptoms.

73.     In May 2020, the U.S. Department of Labor's Wage and Hour Division found that, by failing to pay sick leave to an employee who tested positive for COVID-19 and self-quarantined, Noah's Ark had violated the Families First Act and ordered it to pay back wages.

74.     Other plants across the country are giving sick leave to all workers who have symptoms of COVID-19, and are taking proactive steps to make sure that symptomatic people do not stay at work.  Some plants are going even further and paying sick leave to asymptomatic people in high-risk categories, or people with recent exposures to a COVID-positive person.  But Noah's Ark is not even consistently providing the bare basics.

### *Onsite Testing*

75.     No testing for COVID-19 is happening at Noah's Ark.  The plant is not testing its workers when they have symptoms, or when they are exposed to a co-worker with symptoms.  It does not perform any random testing of asymptomatic workers to identify emerging spikes.

76.     Noah's Ark does not do any contact tracing when it learns that a worker has tested positive.  Nor does it inform workers who were in close proximity that they may have been exposed.

77.     The only screening at the plant is a temperature check when workers arrive for their shift.  But temperature checks cannot identify infected and contagious workers who do not have a fever.  Temperature checks alone do not prevent infected workers from entering the plant and infecting others.

78.     Though the plant is open every day, temperature checks are not offered on Sundays because the plant's nurse does not work that day.  The same is true every other Saturday.  No health screening occurs on those days.

79.     When a worker has a high fever, at most the plant will tell them to find a test on their own outside the plant.  The plant does not offer to pay for the test.  Many workers at Noah's Ark are uninsured and cannot afford a COVID-19 test or a doctor's visit.

80.     Many other meatpacking plants have arranged for private testing companies to test their workers.  Testing services are widely available in Nebraska for Noah's Ark to hire.

### An Outbreak at Noah's Ark Would Quickly Spread into the Surrounding Community

81.     The risk of COVID-19 infection and death is not borne by Noah's Ark workers alone.  Individuals who become infected at work bring the virus home to their families and communities, causing infections to spread through their households, places of worship, local

businesses, schools, and medical facilities.  Noah's Ark's failure to protect its workers represents a threat to the entire Hastings and Tri-Cities community.

82.     Nationally, meatpacking plants have played an outsized role in spreading COVID-19.  Counties with meatpacking plants have significantly higher rates of infection—meaning a greater percentage of the population has been infected—compared with counties that do not have meatpacking plants.  As of May 2020, six of the ten counties with the highest infection rates in the United States had meatpacking outbreaks.  Their rates were higher than the hardest-hit cities, like New York, Detroit, Chicago, and Los Angeles.  After the first major wave of outbreaks, rural counties with meatpacking outbreaks had infection rates five times higher than rural counties without a meatpacking outbreak.

83.     Some of Nebraska's worst outbreaks have been in rural counties with meatpacking plants.  For example, an outbreak at the Tyson beef plant in Dakota City turned the surrounding community into a hotspot, with the fourth highest infection rate in the country at the time.

84.     The same is true of Adams County, where the Noah's Ark plant is located.  After the plant's first outbreak, Adams County had an infection rate far higher than neighboring counties without a meatpacking outbreak.  As of June 1, its infection rate of 873 cases per 100,000 people was between twice as high and thirty-six times as high as neighboring counties without a meatpacking cluster, including Nuckolls, Webster, and Clay Counties.

85.     The same occurred in nearby Hall County, where some of the plaintiffs live in the city of Grand Island, and which had a meatpacking outbreak in April and May.  During that time, Hall County's infection rate skyrocketed far above that of neighboring Hamilton and Merrick Counties, which do not have a major meatpacking plant.

86.     The community spread that results from a meatpacking outbreak also crosses county lines.  For instance, in May, Lancaster County health officials attributed almost one-third of Lancaster County cases to a recent outbreak at the Smithfield pork processing plant in neighboring Saline County.

87.     It is therefore clear that outbreaks in meatpacking plants quickly spread to the surrounding community and greatly increase the rate of community transmission.

88.     Hastings and Grand Island are close geographically, economically, and socially. Many workers commute from one city to the other to work, do business, and socialize.  Together with Kearney, they are known as the Tri-Cities.

89.     A surge of cases originating at Noah's Ark would have severe consequences for hospitals and clinics in the Tri-Cities area.  During the first spike of cases in May, Plaintiff Leonard's medical practice had to engage in an onerous contact tracing effort after just one employee became infected.  The hospital where he works faced a shortage of personal protective equipment (PPE) and ventilators.  Another surge of cases in the region could flood his practice and others with COVID-19 patients, divert resources to contact tracing and other precautions, and cause renewed PPE shortages.

90.     An outbreak at Noah's Ark could similarly affect countless people and businesses in the region.  By fueling community spread, it could result in local shutdown orders, businesses having to close their doors to the public, family members unable to visit each other, and places of worship having to cancel in-person services.

91.     If Noah's Ark does not implement meaningful COVID-19 protections soon, it is likely to cause or exacerbate all of these problems by increasing the rate of spread in the broader community.  This danger is becoming more acute as winter approaches and large spikes become

more likely.  The entire region has a strong interest in ensuring that Noah's Ark implements basic COVID-19 protections for its workforce.

### Noah's Ark Workers Have No Other Avenue for Redress

92.     This lawsuit is the only remaining avenue for Noah's Ark workers and their community to ensure that the plant protects against another outbreak.

93.     Plaintiffs and other workers have raised the problems described above with managers multiple times.  Plaintiffs Alma and Antonio also raised these issues with the plant's nurse.  The managers and nurse have refused to address them.

94.     Plaintiffs have reported these dangers to the Occupational Safety and Health Administration ("OSHA").  OSHA has not taken any action to make Noah's Ark improve its precautions.

95.     In August and September 2020, Plaintiff Antonio called the OSHA Area Office in Omaha to report the dangers at Noah's Ark.  He explained that Noah's Ark was not taking adequate COVID-19 precautions, including failing to distance workers, replace soiled masks, and conduct temperature checks on Sundays.  OSHA's field manual requires the agency to act on workplace-danger reports made by telephone.  Yet OSHA personnel declined to investigate Antonio's complaint.

96.     In August 2020, another worker filed a written complaint with OSHA.  The complaint raised all of the problems described above: no physical distancing, soiled masks not being replaced, workers kept in the plant despite symptoms, no testing.  Three months later, OSHA has yet to provide even an update, and none of the primary failures identified in the complaint have been fixed.  On information and belief, OSHA has not ordered Noah's Ark to fix these conditions.

97.     On information and belief, an OSHA inspector visited the plant in early September.  He spent under an hour touring the plant.  Managers told workers that the plant was given advance notice of the visit, contrary to OSHA's field manual.  None of the four failures described above has changed since the inspector's visit.

98.     OSHA has refused to issue any binding COVID-19 rules for meatpacking plants or any other workplace.  It has put out a guidance document that lists more than a dozen possible precautions that plants can take, but the document does not make any of the precautions mandatory.

99.     In response to complaints at other plants, OSHA has declined to seek a single emergency order to require a plant to adopt basic precautions.  After outbreaks at hundreds of plants across the country, OSHA has issued a total of four citations to meatpacking plants, none of which has any effect while the citations are being adjudicated—a process that typically takes several years.

100.    No state or local agency in Nebraska has imposed any safety requirements on the Noah's Ark plant, even after the plant's initial outbreak in May.  On information and belief, the Nebraska Department of Labor has instituted no enforcement actions to protect meatpacking workers from COVID-19.

## FIRST CLAIM FOR RELIEF

### (Public Nuisance)

101.    All the foregoing allegations are repeated and realleged as if fully set forth herein.

102.    Noah's Ark's failure to implement the most basic and essential COVID-19 protections has caused and is reasonably certain to cause the transmission of COVID-19 both inside and outside the plant.

19

103.    This transmission has caused and will cause widespread disease, hospitalizations, and death, not only among Noah's Ark workers, but also their family members, the people they live and socialize with, and members of the public with whom they interact.  Such transmission caused by Noah's Ark will lead to the closing of businesses, schools, and places of worship.

104.    Noah's Ark's policies and practices constitute a public nuisance.  They substantially and unreasonably interfere with the common public right to public health and safety, because they create a substantially heightened risk of spreading a deadly virus.

105.    Absent prompt and immediate injunctive relief, Plaintiffs face a significant and unique risk of irreparable harm in the form of physical, emotional, and economic injuries.

106.    Defendant's past and ongoing conduct is a direct and proximate cause of Plaintiffs' injuries and threatened injuries.

107.    Defendant knows and should have known that its conduct as alleged herein would be the direct and proximate cause of Plaintiffs' injuries.

108.    Plaintiffs therefore request a declaration that Noah's Ark's policies and practices constitute a public nuisance, and they request injunctive relief to abate the nuisance.

## SECOND CLAIM FOR RELIEF

### (Breach of Duty to Provide a Safe Workplace; Negligence)

109.    All the foregoing allegations are repeated and realleged as if fully set forth herein.

110.    Noah's Ark has a duty to furnish its employees with a reasonably safe place in which to work.  Noah's Ark voluntarily assumed this duty of care.

111.    By failing to implement basic and critical protections against COVID-19, Noah's Ark breached and continues to breach this duty.

112.     Noah's Ark's breach of its duty has caused harm to Plaintiffs, who have suffered physical harm associated with COVID-19 infection, emotional harm, and in some cases monetary harm.  These injuries were foreseeable.

113.     Plaintiffs are likely to experience future harm if Noah's Ark does not immediately satisfy its duty to provide a reasonably safe workplace.

114.     Plaintiffs request a declaration that Noah's Ark has breached and is breaching this duty, and they request injunctive relief to ameliorate the breach.

### THIRD CLAIM FOR RELIEF

### (Violation of the Families First Coronavirus Response Act)

115.     The Families First Coronavirus Response Act requires employers to "post and keep posted, in conspicuous places on the premises of the employer where notices to employees are customarily posted, a notice . . . of the requirements described in the Act," including its paid sick and family leave provisions.  29 U.S.C. § 2601 note; *see* 29 C.F.R. § 826.80.  Employers must also provide "information concerning the procedures for filing complaints of violations of the [Families First Act] with the [Department of Labor's] Wage and Hour Division."  29 C.F.R. § 826.80(a).

116.     Noah's Ark has not posted any notice about the Act, including its requirements or the procedures for filing complaints for violations of the Act.

117.     Noah's Ark is in violation of the Families First Coronavirus Response Act's notice requirement.  That violation has interfered with workers' ability to exercise their rights to paid sick leave under the Act.

118.     Plaintiffs request a declaration that Noah's Ark is in violation of the Families First Coronavirus Response Act and an injunction ordering it to comply with the Act's requirements.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully pray for the following relief:

a. A declaration pursuant to 28 U.S.C. § 2201 that Defendant has caused a public nuisance, violated its common-law duty to provide a reasonably safe workplace, and violated the Families First Coronavirus Response Act;

b. A preliminary and permanent injunction requiring Defendant to:

    i. Space workers at least six feet apart in the processing areas, the cafeteria, and in the other common areas;

    ii. Provide workers with a constant supply of clean masks;

    iii. Provide paid sick leave to any worker who has any symptom of COVID-19 or a positive COVID-19 test or diagnosis;

    iv. Provide onsite COVID-19 testing in accordance with accepted testing standards;

    v. Implement all other precautions required to remedy these violations;

    vi. Communicate all of these policies clearly to workers;

    vii. Comply with the requirements of the Families First Coronavirus Response Act, including the notice requirement.

c. An order awarding Plaintiffs the costs of suit and reasonable attorneys' fees pursuant to any applicable law;

d. Such further relief as the Court deems equitable, just, and proper.

## DESIGNATION OF PLACE OF TRIAL

Plaintiffs request a trial to the Court in Lincoln, Nebraska.

Dated: November 23, 2020

Spencer Amdur*
Julie Veroff*
ACLU Foundation
39 Drumm Street
San Francisco, CA 94111
T: (415) 343-0770
F: (415) 395-0950
*samdur@aclu.org*
*jveroff@aclu.org*

Lee Gelernt*
Noor Zafar*
ACLU Foundation
125 Broad Street, 18th Floor
New York, NY 10004
T: (212) 549-2660
F: (212) 549-2654
*lgelernt@aclu.org*
*nzafar@aclu.org*

*Attorneys for Plaintiffs*
*\*Pro hac vice application forthcoming*

Respectfully submitted,

/s/ Adam Sipple
Adam Sipple (SBN 20557)
Rose Godinez (SBN 25925)
ACLU Foundation of Nebraska, Inc.
134 S. 13th St. #1010
Lincoln, NE 68508
T: (402) 476-8091
*ajsipple@aclunebraska.org*
*rgodinez@aclunebraska.org*

Maren Lynn Chaloupka (SBN 20864)
Chaloupka Holyoke Snyder Chaloupka &
Longoria, P.C., L.L.O.
1714 2nd Avenue
P.O. Box 2424
Scottsbluff, NE 69363-2424
T: (308) 635-5000
F: (308) 635-8000
*mlc@chhsclaw.net*