## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA
## LINCOLN DIVISION

| | |
|---|---|
| ALMA, et al., | ) |
| | ) |
| | ) |
| *Plaintiffs*, | ) Case No.: 4:20-cv-03141 |
| | ) |
| v. | ) |
| | ) **BRIEF IN SUPPORT OF MOTION** |
| NOAH'S ARK PROCESSORS, LLC., | ) **FOR PRELIMINARY INJUNCTION** |
| | ) |
| *Defendants*. | ) |
| | ) |
| | ) |

## INTRODUCTION

Plaintiffs seek a preliminary injunction requiring Noah's Ark Processors, LLC ("the plant") to implement four basic COVID-19 protections at its beef processing plant in Hastings: physical distancing, masks, paid sick leave, and testing. These protections are simple and essential. Other meatpacking plants are providing them, and experts and health officials widely agree that they are necessary to prevent further outbreaks in this setting. Yet Noah's Ark has refused to provide any distancing or testing at all. And its mask and sick-leave practices are so deficient that its workers are frequently working without masks and with clear COVID-19 symptoms.

These failures are a public nuisance because they threaten to accelerate the spread of COVID-19 in the plant and throughout the surrounding community—just as happened the last time Noah's Ark had an outbreak in April and May. The plant is also violating its common-law duty to provide a safe workplace, because it is not taking easy steps that are necessary to prevent severe illness and death. And the plant is violating the sick-leave rules in the Families First Coronavirus Response Act. The Court should order Noah's Ark to fix these egregious conditions, as detailed

1

in the Proposed Order.  Other courts have ordered similar protections when faced with employers that refused to implement even the bare basics to protect their workers and the public.

The conditions at Noah's Ark are alarming.  The plant has done nothing to provide physical distancing despite numerous viable options.  Every day in the processing areas, hundreds of workers stand 1-2 feet apart, often without any barriers between them, their elbows touching, for at least 8 hours at a time.  Dozens of workers at a time crowd into the plant's small, windowless cafeteria, where they sit packed along benches and must remove their masks to eat, which means they are breathing directly onto their neighbors sitting inches away.  The plant does not promptly replace wet and soiled masks, so workers must lower them below their noses and mouths in order to breathe.  Meanwhile, sick people keep coming to work because Noah's Ark allows people with fevers to keep working, threatens to fire people who stay home sick, refuses to pay many who stay home with symptoms, and has not posted or announced any paid sick leave policies.  On top of all this, Noah's Ark is not providing any testing or contact tracing to its employees.  If and when another surge comes, the plant and its workers will once again have no idea until it is too late.

Essential workers should not be forced to endure these conditions, which are eminently fixable.  During a pandemic that has required everyone to take new safety precautions, Noah's Ark is refusing to do its part and denying the most vital protections for its workers.  They should not have to show up for work every day fearing for their lives.

Nor should their families, friends, or the public be exposed to the increased risk of community transmission that comes from the plant's refusal to adopt responsible safety practices.  The last time Noah's Ark had an outbreak, infections and deaths in the surrounding county shot above its neighbors.  The same thing has happened nationwide in the wake of meatpacking outbreaks, which have continued throughout the pandemic.  Another outbreak at Noah's Ark could

close businesses, schools, and places of worship in Hastings and the Tri-Cities.  The entire community has a strong interest in proper infection control measures at Noah's Ark.

The danger of another outbreak at Noah's Ark is growing as winter sets in and cases rise, and the impact of such an outbreak is poised to be even worse than last time, as hospitals near capacity.  These protections are now more urgent than ever.  Workers have raised their concerns with plant managers and federal regulators, but neither has taken any interest in addressing them. This lawsuit is therefore the last opportunity to abate these hazards at Noah's Ark.  Plaintiffs— recent Noah's Ark workers and a local doctor—respectfully ask this Court to issue a preliminary injunction and order the plant to implement these four basic protections.

## BACKGROUND

### A.  Meatpacking Workers Have Faced Persistent COVID-19 Outbreaks.

The COVID-19 pandemic has fallen heavily on workers at meatpacking plants.  Since April, there have been major outbreaks at hundreds of plants across the country.  Perry Decl., Dkt. 19-8 ¶¶ 7-14.  At least 49,000 workers have been infected in these outbreaks and hundreds have died.  *Id.* ¶ 7.  These numbers represent a dramatic undercount, because starting in late May, most plants stopped reporting their case and death numbers to the public, meaning that most outbreaks since then have likely gone unreported.  *Id.* ¶ 9-10.  The Governor of Nebraska even ordered local health officials not to report outbreaks at specific plants.  *Id.* ¶ 10 n.8.

The limited reports that have emerged in recent months, however, make clear that serious outbreaks have continued throughout the pandemic.  In about a dozen states, meatpacking workers have faced new and severe outbreaks stretching through the summer and fall.  Perry Decl. ¶¶ 11, 13-14.  Given the limited reporting, these cases are likely just the tip of the iceberg.

Workers at Noah's Ark have experienced at least one outbreak, in April and May 2020. After the plant initially refused to let people with symptoms stop working, dozens of workers became sick and at least one died.  Alma Decl., Dkt. 19-2 ¶ 29; Isabel Decl., Dkt. 19-3 ¶ 17; Antonio Decl., Dkt. 19-4 ¶ 18.  The outbreak was publicized after the National Guard and local health authorities arranged for a round of testing of the plant's employees.  *Id.*  Since then, Noah's Ark has not reported any case or death numbers to the public.

Meatpacking outbreaks nationwide have imposed severe consequences on workers, their families, and their communities.  COVID-19 has killed hundreds of workers, left others severely ill and hospitalized for weeks, and caused long-term complications for patients known as "long haulers."  Lemieux Decl., Dkt. 19-10 ¶¶ 9, 16-18.  After being infected at work, workers have taken the virus home, where it has sickened and killed countless family members and friends.  A recent study calculated that thousands of excess deaths and hundreds of thousands of excess infections are likely attributable to meatpacking outbreaks.  Perry Decl. ¶ 16; Mujahid Decl., Dkt. 19-1 ¶ 15, Ex. N.  And a large body of research has shown elevated community transmission rates in the wake of meatpacking outbreaks.  Perry Decl. ¶¶ 15, 17-22; Mujahid Decl. ¶¶ 19-20, Exs. R, S.  Rapid community spread has in turn led to stay-at-home orders, business closures, school closures, and shortages of medical equipment.  Meatpacking outbreaks like the one at Noah's Ark affect the whole community.  Perry Decl. ¶ 19; Leonard Decl., Dkt. 19-5 ¶¶ 10-15, 17-25.

**B.  Conditions at the Noah's Ark Plant in Hastings, Nebraska.**

Noah's Ark Processors, LLC, owns and operates a beef processing plant in Hastings, Nebraska.  It employs several hundred workers who work seven days a week to slaughter and process cattle into meat for sale.  The plant's processing areas are divided into three primary floors: a kill floor, where cows are stunned, killed, eviscerated, and prepared for initial cold storage; a

fabrication floor, where carcasses are processed into retail cuts of meat; and a packaging floor, where meat is packaged for shipment and sale. Alma Decl. ¶ 3; Isabel Decl. ¶ 3; Antonio Decl. ¶¶ 3-4. The plant has one cafeteria where all of the workers from one of the three processing floors— and sometimes workers from multiple floors—eat together every day. *Id.* The lunch break lasts for 30 minutes, and the daily work shift lasts for at least 8 hours. *Id.*

The plant is severely crowding its workers in both the processing areas and the cafeteria. Workers remain elbow to elbow in all three processing areas, typically with less than 2 feet of space between them. Alma Decl. ¶ 11; Isabel Decl. ¶ 12; Antonio Decl. ¶ 12. The plant has not increased the distance between workers since the pandemic began. Its hundreds of workers remain pressed up against one another throughout their multi-hour shifts. *Id.* In the cafeteria, too, the plant crowds dozens, and sometimes even hundreds, of workers together in a small windowless room, where they must lower their masks to eat. Alma Decl. ¶¶ 7-8; Isabel Decl. ¶ 7; Antonio Decl. ¶¶ 7-8. With no space between them, they talk and breathe directly onto one another throughout their 30-minute lunch break. Some workers now eat in the hallway or locker room, but the crowding in the cafeteria remains extreme. *Id.*

The plant has installed some barriers in both locations, but they do little to address the crowding. Most workstations in the processing areas lack barriers of any kind. Alma Decl. ¶¶ 16-17; Isabel Decl. ¶ 13; Antonio Decl. ¶¶ 12-14. And barriers on the cafeteria tables do not separate workers sitting next to each other on the benches, or workers standing at the microwave, or workers in the passageways between tables. Alma Decl. ¶ 10; Isabel Decl. ¶ 8; Antonio Decl. ¶ 10. These cafeteria barriers are frequently damaged or missing. *Id.*; Godinez Decl., Dkt. 19-6 ¶ 8, Ex. F-4 (photo).

The plant is not providing any COVID-19 testing for its workers.  Even though workplace testing is now widely available, *see* Harrison Decl., Dkt. 19-7 ¶¶ 35, 37, 47-48; Lauritsen Decl., Dkt. 19-9 ¶ 25, the plant is not testing workers who have symptoms, or workers who have been exposed to sick co-workers, or asymptomatic workers to identify emerging hotspots.  Alma Decl. ¶ 23; Isabel Decl. ¶¶ 17, 20, 26; Antonio Decl. ¶¶ 22, 25.  If and when there is another surge, the plant and the workers will not know until infections are already widespread.  At most, the plant tells workers who have fevers that they can find a test somewhere in the community.  Alma Decl. ¶¶ 23-24; Isabel Decl. ¶ 24; Antonio Decl. ¶ 25.  But the plant does not pay for or otherwise arrange the test, and many of its workers lack insurance and cannot afford a test.  *Id.*  The plant's only symptom screening is a temperature check at the start of each shift, but these do not identify infected people who do not have a fever, and they do not happen on Sundays or some Saturdays.  Alma Decl. ¶ 22; Isabel Decl. ¶ 21; Antonio Decl. ¶ 19.

The plant continues to keep sick people at work.  Plaintiffs Isabel and Antonio were each given this option when they had clear COVID-19 symptoms in July and June, respectively.  Isabel Decl. ¶ 23; Antonio Decl. ¶ 20.  The plant also sometimes pressures sick people to keep working.  For instance, Plaintiff Alma recently witnessed a co-worker almost get fired for missing a day of work while she had a fever.  Alma Decl. ¶¶ 27-28.  The co-worker subsequently worked for the next two weeks despite her ongoing symptoms.  *Id.*  Workers report the plant firing people for staying home sick as recently as November.  *Id.* ¶ 33.  These episodes echo the beginning of the pandemic, when the plant initially refused to let people with symptoms go home or pressured them to return if they were out sick.  Alma Decl. ¶ 29; Isabel Decl. ¶¶ 17, 19; Antonio Decl. ¶ 23.  Since then, the plant has not announced or posted any paid sick leave policies to inform workers that they can go home sick without penalty.  Alma Decl. ¶¶ 26, 33-34; Isabel Decl. ¶ 27; Antonio Decl.

¶ 29.  The widely shared understanding among workers is that they cannot stop working even if they have symptoms.  Alma Decl. ¶¶ 30, 34; Isabel Decl. ¶ 28; Antonio Decl. ¶ 23.

The plant gives workers one paper mask when they start their shift.  Alma Decl. ¶ 18; Isabel Decl. ¶ 15; Antonio Decl. ¶ 17.  These masks, however, quickly become wet and soiled with sweat from exertion and blood, fat, and feces from the animals.  *Id*.  When this happens, workers generally cannot get a new mask right away, because the nurse often runs out, and they do not have access to the nurse while they stand on the processing lines.  Alma Decl. ¶¶ 18-19; Isabel Decl. ¶ 15; Antonio Decl. ¶ 17.  As a result, workers are regularly forced to lower their masks below their noses and mouths for much of their shifts to avoid suffocating.  Alma Decl. ¶ 20; Isabel Decl. ¶ 16; Antonio Decl. ¶ 17.

These dangerous practices are the latest in a long line of recent legal violations that Noah's Ark has committed against its workers.  In 2019, the plant was fined nearly $200,000 after a worker suffered severe burns due to the plant's deficient safety practices.  *See* Mujahid Decl. ¶ 21, Ex. T (citations listing 16 "serious" safety violations).  Several years earlier, the plant, under previous ownership, was fined a similar amount after a worker died using its equipment.  *Id.* ¶ 22, Ex. U (citations listing 9 "serious" violations and 2 "willful" violations, practices an OSHA regional administrator called "unthinkable").  In 2020, the Department of Labor's Wage and Hour Division fined Noah's Ark for refusing to pay a worker the COVID-19-related sick leave required by federal law.  *Id.* ¶ 12, Ex. K.  In 2019, this Court and one other ordered Noah's Ark to end a series of labor violations against workers who sought to bargain collectively and meet with union representatives.  *See* Memo. & Order, *Sawyer v. Noah's Ark Processors, LLC*, No. 4:19-cv-3016, Dkt. 21 (D. Neb. May 10, 2019); Memo. & Order, *UFCW Local No. 293 v. Noah's Ark Processors, LLC*, No. 8:18-cv-466, Dkt. 31 (D. Neb. Jan. 28, 2019).  Both Courts have held the plant in contempt for violating

7

these injunctions.  *See* Memo. & Order, *Sawyer*, Dkt. 36 (Oct. 17, 2019); Order, *UFCW*, Dkt. 80 (Apr. 4, 2020).

### C.  Noah's Ark Workers Have No Other Meaningful Avenues for Relief.

This lawsuit is the Plaintiffs' only remaining chance to get basic COVID-19 safety protections implemented at Noah's Ark.  Over the summer and fall, Plaintiffs Alma, Isabel, and Antonio raised these issues with managers and the nurse multiple times, but the plant refused to make any meaningful changes.  Alma Decl. ¶ 9; Isabel Decl. ¶ 24; Antonio Decl. ¶¶ 11, 16.

Workers then raised these issues with the Occupational Safety and Health Administration ("OSHA"), but OSHA has not ordered any protections.  Antonio called OSHA's Omaha Area Office in August and September to report all of the dangerous conditions at Noah's Ark.  Antonio Decl. ¶ 26.  The OSHA Field Manual requires inspectors to act on telephonic complaints.  *See* OSHA, Field Ops. Manual, Ch. 9 § I.F.  Yet the OSHA inspector told Antonio the agency would take no action in response to his complaint, despite the serious problems he had raised.  Antonio Decl. ¶ 26.

Another worker filed a detailed written complaint with OSHA in late August, which raised all the conditions listed above: no distancing, sick people being kept at work, people forced to work without masks, no testing.  Godinez Decl. ¶¶ 2-3, Ex. F-1 (complaint).  Three months later, OSHA has yet to order any changes, or even explain why it has not done anything about these conditions.  *Id.* ¶¶ 4-5.  An inspector briefly visited the plant in September, but has not issued an order of any kind since the visit.  Alma Decl. ¶ 31; Isabel Decl. ¶ 29; Antonio Decl. ¶ 27.  This is consistent with OSHA's refusal to act on the vast majority of COVID-19 safety complaints involving meatpacking plants.  *See* Mujahid Decl. ¶ 24, Ex. W.

Nor has OSHA imposed any safety requirements on meatpacking plants or other employers more generally. It has declined to issue mandatory safety precautions of any kind during the pandemic. *See* Mujahid Decl. ¶ 25, Ex. X. It has issued a general meatpacking guidance document, which lists more than a dozen precautions that employers can take. *Id.* ¶ 18, Ex. Q. But the guidance is just a list of optional suggestions. It does not make any of them mandatory.

This lawsuit is therefore the last chance for Noah's Ark workers and the community around them to achieve basic protections against another COVID-19 surge.

## STANDARD OF REVIEW

The decision to grant a preliminary injunction rests in the Court's discretion. *See Jet Midwest Int'l Co., Ltd. v. Jet Midwest Group, LLC*, 953 F.3d 1041, 1044 (8th Cir. 2020). To obtain an injunction, Plaintiffs must show that they are likely to succeed on the merits, that they face irreparable harm absent an injunction, and that the public interest and balance of equities favor an injunction. *Id.* (citing *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc)).

## ARGUMENT

Noah's Ark is failing to implement four COVID-19 protections that are essential to prevent another outbreak: physical distancing, universal masks, paid sick leave, and testing. Withholding any one of them would impose an unacceptable risk to workers and the public, but together the danger is enormous. These failures constitute a public nuisance, violate the plant's common-law duty to provide a safe workplace, and violate federal paid-leave law. As other courts have done when faced with such egregious conditions, this Court should order Noah's Ark to provide these four baseline protections.

## I.     Noah's Ark's Practices Are a Public Nuisance.

The deficient safety practices at Noah's Ark threaten to spread a new wave of infections, hospitalizations, and deaths among its workers and throughout the local community.  Since the pandemic began, multiple courts have enjoined similar nuisances and ordered employers and other entities to provide a basic level of safety protection to their workers and the public.  *See, e.g.*, Order Granting TRO, *Hernandez v. VES McDonald's*, No. RG-20064825 (Cal. Sup. Ct. June 22, 2020) (ordering employer to provide distancing, masks, and adequate sick leave, among other things); Order Granting Preliminary Injunction, *Massey v. McDonald's Corp.*, No. 20-CH-4247 (Ill. Cir. Ct. June 24, 2020) (ordering employer to implement distancing and universal masks); Mujahid Decl. ¶¶ 26-27, Exs. Y, Z (attaching both opinions); *see also Banks v. Booth*, 468 F. Supp. 3d 101, 125 (D.D.C. 2020) (ordering correctional facility to implement distancing and testing, among other protections); *Ramsundar v. Wolf*, 2020 WL 2557832, \*4 (W.D.N.Y. May 20, 2020) (same); TRO Order, *Seth v. McDonough*, No. 8:20-cv-1028, Dkt. 85 (D. Md. May 21, 2020) (same).  The Court should do the same here.

### A.  The Plant's Failure to Take Necessary Precautions Against the Spread of Disease Is a Public Nuisance that Must be Enjoined.

The principles governing public nuisance are well established.  Under Nebraska law, "[a] public nuisance is an unreasonable interference with a right common to the general public." *State ex rel. Spire v. Strawberries*, 239 Neb. 1, 9 (1991) (quotation marks omitted).  Such interference includes both "acts and omissions" that "interfere[] with public health, safety, and comfort." Restatement (Second) of Torts §§ 824, 821B; *see, e.g.*, *State ex rel. Hunter v. The Araho*, 289 N.W. 545, 551 (Neb. 1940) (conduct that "endanger[s] the public health" is a nuisance) (quotation marks omitted); *Wilsonville v. SCA Servs., Inc.*, 426 N.E.2d 824, 838 (Ill. 1981) (action that poses a "threat to the public health" is a nuisance).

10

In particular, the failure to take necessary precautions against the spread of a disease has long been treated as a public nuisance. From its inception, public nuisance law has targeted "disease-breeding" action, *Roth v. City of St. Joseph*, 147 S.W. 490, 491 (Ks. Ct. App. 1912), such as "keeping diseased animals or the maintenance of a pond breeding malarial mosquitoes." Restatement § 821B cmt. b (describing early common law). Courts have consistently held that the "failure to observe proper sanitary conditions," which could worsen an "outbreak," is a public nuisance that should be abated. *United States v. Rainbow Family*, 695 F. Supp. 314, 327, 330 (E.D. Tex. 1988); *see, e.g.*, *Mayor & Aldermen of Savannah v. Mulligan*, 22 S.E. 621, 622 (Ga. 1894) (action that could spread "a highly contagious disease" was a nuisance); *Smith v. Baker*, 20 F. 709, 709-10 (S.D.N.Y. 1884) (failure to "exercis[e] due care to prevent taking diseases" into public); Restatement § 821B cmt. g ("[T]he threat of communication of smallpox to a single person may be enough to constitute a public nuisance because of the possibility of an epidemic.").

When a public nuisance exposes the public to a "threatened injury" like the spread of a deadly disease, an "[i]njunction is a proper remedy." *Spire*, 239 Neb. at 11-12. Because the defendant's failure to "eliminate [] dangerous conditions" poses "a menace to public health and safety," it becomes "a matter of public necessity" that the nuisance be abated. *Heffelbower v. City of Lincoln*, 2003 WL 22390636, *5 (Neb. Ct. App. Oct. 21, 2003). An abatement injunction typically orders the specific "sanitary and hygienic practices" that are "necessary to protect the public health and safety." *Rainbow Family*, 695 F. Supp. at 317, 330; *see, e.g.*, *id.* at 330 n.5 (relying on "[e]xpert witnesses" to identify the "appropriate" safety precautions); *Massey*, *supra* (ordering the necessary protections); *Hernandez*, *supra* (same).

11

**B. The Protections the Plant Lacks Are Critical to Prevent the Spread of COVID-19.**

Noah's Ark has refused to properly implement safety measures—distancing, masks, sick leave, and testing—that are widely considered "necessary to protect the public health" from rapid COVID-19 transmission, especially in a crowded indoor setting. *Rainbow Family*, 695 F. Supp. at 317. Other plants have implemented these measures. At this point in the pandemic, there is no excuse for not providing them.

**1. Physical Distancing**

Physical distancing is widely considered the most important safeguard against the spread of COVID-19. Harrison Decl. ¶¶ 21-24, 27; Lemieux Decl. ¶ 11; Perry Decl. ¶ 32. The reason is simple: The virus travels through the air, so when people are close together, especially indoors and for hours at a time, they will breathe the virus onto one another and inhale each other's respiratory particles. Lemieux Decl. ¶ 11. Distancing is accordingly treated as the most critical precaution by the World Health Organization, the Centers for Disease Control ("CDC"), the University of Nebraska Medical Center, and countless other government and academic institutions. Harrison Decl. ¶ 23 (collecting guidance, rules, and studies). In meatpacking especially, rules and guidance universally recognize that distancing is critical among workers who spend hours indoors together. OSHA's list of meatpacking recommendations puts physical distancing at the top of the list. *Id.* ¶ 24; Mujahid Decl. ¶ 18, Ex. Q. The states that have issued meatpacking rules for the pandemic have required distancing. Harrison Decl. ¶ 24 n.14. And multiple plants around the country are doing it. Lauritsen Decl. ¶¶ 10-17.

Noah's Ark has failed to distance its workers at all. All day every day, during their shifts, breaks, and lunch, workers stand within 1-2 feet of each other.

On the processing lines, Noah's Ark places workers shoulder to shoulder, elbow to elbow, for eight hours or more, breathing heavily from the work and often lowering their soiled masks. Alma Decl. ¶¶ 11-13; Isabel Decl. ¶¶ 12-13, 16; Antonio Decl. ¶¶ 12-14, 17; Godinez Decl. ¶ 2, Ex. F-1 at 2. This crowding is exactly the same as it was before the pandemic—the plant has done nothing to increase the space between its employees, like leaving some workstations empty, using excess line space, slowing the line, or adding a shift and reducing the number of workers per shift. Lauritsen Decl. ¶¶ 11-14. While the plant has installed a few plastic barriers, much of the fabrication floor lacks them, and they are totally absent from the kill floor and packaging floor. Alma Decl. ¶¶ 16-17, 32; Isabel Decl. ¶¶ 13, 31; Antonio Decl. ¶ 29.

The situation is no better in the small windowless cafeteria. Workers on each processing floor are made to take their breaks at the same time, so every day, dozens of people crowd into this small space. Many days, when the plant requires multiple processing floors to break together, a hundred workers can be packed into this small room for 30 minutes at a time. Alma Decl. ¶¶ 7-8; Isabel Decl. ¶ 7; Antonio Decl. ¶¶ 7-8. They sit pressed up against one another on benches, eating without masks and breathing directly onto each other. Alma Decl. ¶ 7; Isabel Decl. ¶ 7; Antonio Decl. ¶ 8; Godinez Decl. ¶ 6, Exs. F-2 (photo). The microwaves are positioned such that, with so much crowding, there is no way to use them without standing right next to other workers. Alma Decl. ¶ 7; Godinez Decl. ¶ 7, Ex. F-3 (photo). The plant has not taken any of the steps other plants have taken to reduce cafeteria crowding, like staggering lunch shifts or building temporary outdoor lunch shelters. Lauritsen Decl. ¶¶ 15-16; Alma Decl. ¶ 32 (noting a couple of outdoor tables that go unused during the winter because they lack shelter and heat); Antonio Decl. ¶ 29 (same).

These conditions are unacceptably dangerous and should be enjoined immediately. There are numerous ways for the plant to distance people six feet or more in both the cafeteria and the

processing areas, as other plants have done.  *See* Lauritsen Decl. ¶¶ 10-17 (explaining that other plants have ensured six feet of distance in both areas).

The need for distancing is not lessened by the plant's intermittent and incomplete use of paper face masks or plastic barriers.  First, masks and barriers are more often than not absent at Noah's Ark:  People eat without masks in the cafeteria and work without them when they get wet.  *See infra* Part I.B.2.  There are no plastic barriers at most workstations, and the barriers in the cafeteria do not actually separate workers.  *Infra*.  Second, even when barriers and masks are properly implemented, they do not prevent the virus's airborne spread, especially when virus particles have many hours to build up in the air.  *See* Harrison Decl. ¶ 25; Perry Decl. ¶ 31.

This is clear from the large outbreaks that have continued to occur *in spite of* these measures.  For instance, a Foster Farms plant closed in September amidst hundreds of cases and multiple deaths, despite using masks and barriers throughout the plant.  *See* Harrison Decl. ¶ 25 n.17; Perry Decl. ¶ 13.  The CDC has similarly explained that, in a meatpacking plant, physical distancing is necessary in addition to masks, because "no single control measure likely will eliminate transmission."  Mujahid Decl. ¶ 13, Ex. L.  And state meatpacking rules recognize the same, because they mandate distancing in addition to masks, barriers, and other measures.  Harrison Decl. ¶ 24 n.14.

### 2.  Universal Masks

In conjunction with distancing, face coverings are widely considered a necessary precaution.  While they do not eliminate transmission by themselves, they do lower the risk of infection.  Lemieux Decl. ¶ 11; Perry Decl. ¶¶ 30-31.  It is virtually impossible to find a COVID-19 rule or guidance that does not strongly recommend their universal use, both in meatpacking and everywhere else.  Harrison Decl. ¶ 28.

14

Noah's Ark has not implemented universal mask use.  While the plant gives workers a single paper mask when they begin a shift, the mask quickly becomes wet with sweat and soiled with blood and fat from the meat.  Alma Decl. ¶ 18; Isabel Decl. ¶ 15; Antonio Decl. ¶ 17; Lauritsen Decl. ¶ 19 (noting that this is common in meatpacking plants).  The plant regularly does not replace wet and soiled masks, which workers must lower or remove to avoid suffocation.  *Id.*; *see* Lemieux Decl. ¶ 10 (explaining that virus is exhaled through the nose).  Workers cannot promptly get a new mask for three reasons: First, only the nurse keeps a supply of masks, and she is not present in the processing areas.  As a result, workers often cannot get a new mask from her until their next break, which could be hours away.  Alma Decl. ¶ 19; Isabel Decl. ¶ 15; Antonio Decl. ¶ 17.  Second, even if a worker manages to get to the nurse during a break, the nurse often runs out of masks.  Alma Decl. ¶ 19; Isabel Decl. ¶ 15; Antonio Decl. ¶ 17.  Third, the nurse does not work on Sundays so workers do not get replacement masks that day.  Alma Decl. ¶ 32.  This poses an enormous danger, especially in light of the crowding, because it means that workers are often breathing directly onto their immediate neighbors with no barrier of any kind.

The Court should order Noah's Ark to provide a constant supply of clean masks throughout the plant.

### 3.  Paid Sick Leave

The basic necessity of paid sick leave is beyond doubt and universally recognized.  Without it, sick people will keep working and infect their co-workers.  Harrison Decl. ¶¶ 31, 33.

To ensure that sick people do not come to work, several things are necessary.  First, sick leave policies need to be clearly and widely communicated, so that workers know they will not lose income for staying home sick.  Second, workers with symptoms must not be allowed or pressured to keep working.  Third, workers must be paid even if they later test negative, or if they

15

cannot afford a test; otherwise, sick people will keep working because they risk not being paid if their symptoms turn out to be something other than COVID-19. These practices are basic and essential. Harrison Decl. ¶ 32; Perry Decl. ¶ 33; Lemieux Decl. ¶ 15; Lauritsen Decl. ¶¶ 22-23.

Noah's Ark is failing on all of these counts. It has not posted its sick leave policies within the plant or otherwise communicated them to workers. Alma Decl. ¶¶ 26, 33; Isabel Decl. ¶ 27; Antonio Decl. ¶¶ 23, 29. Indeed, none of the Plaintiffs or anyone they know at the plant has seen the plant's policies. *Id.* The plant regularly offers people with fevers and other symptoms the option to keep working, as two Plaintiffs have personally experienced. Isabel Decl. ¶ 23; Antonio ¶ 20. It has pressured Plaintiffs and others to keep working or return to work while sick. Alma Decl. ¶¶ 27-28, 33; Isabel Decl. ¶ 19; Antonio Decl. ¶ 18; Godinez Decl. ¶ 2, Ex. F-1 at 1. And it refuses to pay sick workers who cannot afford a COVID-19 test, or who test negative. Isabel Decl. ¶ 27; Godinez Decl. ¶ 2, Ex. F-1 at 1.

The combined effect of these failures is that workers widely understand that they cannot miss work even if they have COVID-19 symptoms. Alma Decl. ¶¶ 33-34; Isabel Decl. ¶ 28; Antonio Decl. ¶ 23. As a result, sick people continue to work at Noah's Ark, afraid to stay home because they reasonably fear they will lose the income they and their families depend on. *See* Gladys Godinez Decl., Dkt. 2-6 ¶ 5. The Court should order the plant to announce and provide proper sick leave.

### 4.  Testing

Rapid COVID-19 testing is a critical backstop to identify case clusters before they spiral into a full-blown outbreak. Harrison Decl. ¶¶ 34-39; Perry Decl. ¶¶ 34-35. The virus spreads quickly, and infected people can transmit it for days and even weeks before they develop symptoms; in that time they can infect dozens of co-workers. Harrison Decl. ¶¶ 10, 38; Lemieux

16

Decl. ¶ 13.  Testing is the only way to identify these pre-symptomatic people and have them quarantine before their infections spread.  Lemieux Decl. ¶ 14.  Without testing, there is no way to know when hotspots are building, and in what parts of the plant.

The Foster Farms outbreak provides a recent example of the need for testing.  *See* Harrison Decl. ¶ 39.  For months, the plant had implemented certain protections like masks, plastic barriers, and temperature checks.  But these did not prevent a cluster from beginning in late summer.  County officials urged the plant to adopt a testing program, but the plant declined and tried to handle the emerging cluster just by sending sick people home.  By the end of August, the outbreak had spiraled out of control, with hundreds of workers sick and several dead.  The plant was finally forced to close and implement a testing program going forward.  *Id.*; Perry Decl. ¶ 13; Mujahid Decl. ¶ 14, Ex. M.  This outbreak was more public than most, because the local health department reported developments in real time.  Other recent outbreaks have likely followed a similar pattern, but most plants and health departments are not making this information public.  *See* Perry Decl. ¶¶ 9-10 (explaining the lack of reporting).

Testing is widely considered an essential element of any COVID-19 prevention strategy, especially in a high-risk indoor setting.  Harrison Decl. ¶ 34-38.  It is recommended or required by all manner of public health guidance, and has been implemented by hundreds of employers.  *Id.*  This is especially true in the meatpacking industry, where multiple large producers have announced widespread testing programs to catch burgeoning clusters.  *Id.* ¶ 37.  These programs test not just symptomatic and exposed workers, but also a regular sample of asymptomatic workers to identify hotspots before they spiral.  *Id.*; Mujahid Decl. ¶¶ 16-17, Exs. O, P.

Workplace testing is easy to set up.  There are now numerous rapid tests designed for workplace settings, and numerous companies that will provide the necessary services.  Harrison

Decl. ¶¶ 36, 47-48.  In addition, local health departments and other government agencies regularly help employers set up testing programs, especially in industries like meatpacking that face a unique risk of large outbreaks.  Harrison Decl. ¶ 46.

Noah's Ark has done none of this.  There are no COVID-19 tests being administered to workers at the plant.  Alma Decl. ¶¶ 23-25; Isabel Decl. ¶¶ 22-24; Antonio Decl. ¶ 25; Godinez Decl. ¶ 2, Ex. F-1 at 2.  The plant does not test its workers when they have a fever or other symptoms, or reimburse them when they seek testing on their own; it does not test or reimburse them when a close contact of theirs at work becomes sick; and it does not test any asymptomatic workers.  *Id.*  Nor does the plant inform workers when they have been exposed to a person who develops symptoms or gets a positive test—none of the Plaintiffs have ever experienced or heard of the plant doing this.  Alma Decl. ¶ 25; Isabel Decl. ¶¶ 20, 26; Antonio Decl. ¶ 22; Godinez Decl. ¶ 2, Ex. F-1 at 2.  This leaves the plant and its workers utterly defenseless against another wave of infections in the coming weeks or months.  Once again, the workers will not know until it is too late.

Instead of providing tests, the plant at most tells workers who already have fevers to find a test out in the community, and does not pay for or otherwise arrange the test.  Isabel Decl. ¶ 24.  But many of its workers lack insurance and cannot afford a COVID-19 test, so even people with fevers often cannot get tested.  *Id.* ¶ 22; Alma Decl. ¶ 24.  And as mentioned, even with a fever, the plant still lets or makes the person keep working.  Alma Decl. ¶ 27; Isabel Decl. ¶ 23; Antonio Decl. ¶¶ 20-21.  Even more fundamentally, the critical role of a testing program is to identify cases *before* people progress to a fever, at which point they have been spreading the virus for multiple days already.  Lemieux Decl. ¶¶ 13-14; Harrison Decl. ¶¶ 10, 38, 40.  The plant is doing nothing on this front.

18

The plant's only other health screening is to take workers' temperature at the door. This, too, is not uniform, because only the one nurse does it, and she is never present on Sundays and often out on Saturdays. Alma Decl. ¶ 22; Isabel Decl. ¶ 21; Antonio Decl. ¶ 19; Godinez Decl. ¶ 2, Ex. F-1 at 2. On those days, there is no health screening of any kind. But even if checking temperatures was uniform, again, transmission happens before people have symptoms. Lemieux Decl. ¶ 13; Harrison Decl. ¶¶ 10, 38; Mujahid Decl. ¶ 23, Ex. V (CDC statement that "[p]ersons with asymptomatic and presymptomatic infection are significant contributors to community SARS-CoV-2 transmission"). Temperature checks do not identify *any* asymptomatic cases, or even people who have symptoms but not a fever. These checks are widely considered insufficient to identify emerging hotspots. Lemieux Decl. ¶ 14; Harrison Decl. ¶ 40; Perry Decl. ¶ 36.

The Court should order Noah's Ark to implement a testing program. There are numerous available tests and viable ways to structure the program. Harrison Decl. ¶¶ 36, 41-45. Plaintiffs' experts, who have designed testing programs for other workplaces including meatpacking plants, are available to help. *Id.* ¶ 46.

**C.  An Outbreak at Noah's Ark Would Exacerbate Community Transmission.**

There can be little doubt that another outbreak at Noah's Ark would spread into the surrounding community and increase infections, hospitalizations, and deaths. The last time Noah's Ark had an outbreak, Adams County's infection numbers shot above its neighbors, with an infection rate ranging from twice as high to thirty times higher than neighboring counties without meatpacking plants. *See* Perry Decl. ¶ 25. The exact same thing has happened in countless meatpacking communities around the country. *Id.* ¶¶ 15-26.

In fact, it is unclear how an outbreak could be contained to the facility, given the virus's high transmission rate and workers' connections to family, friends, local businesses, and places of

worship.  *See* Lemieux Decl. ¶ 10.  Throughout the pandemic, researchers have documented how community spread results from a large central cluster, be it a social gathering, a prison, a university, or a workplace.  Perry Decl. ¶ 23.

Academic studies have unanimously tied meatpacking outbreaks to increased community spread.  Most significantly, a recent peer-reviewed study, published in the Proceedings of the American Academy of Sciences, determined that hundreds of thousands of COVID-19 cases early in the pandemic, and thousands of deaths, were "likely related to community spread outside [meatpacking] plants."  Mujahid Decl. ¶ 15, Ex. N at 1; Perry Decl. ¶ 16 (describing the study).  The study shows that meatpacking outbreaks spark "local community transmission" and "accelerate the spread of the virus."  Mujahid Decl. ¶ 15, Ex. N at 1.  Numerous other studies confirm the same phenomenon.  *See* Perry Decl. ¶¶ 17-21; Mujahid Decl. ¶¶ 19-20, Exs. R, S.

It is thus clear that Noah's Ark's practices are a threat to people and institutions throughout the Tri-Cities area.  *See infra* Part IV (explaining the harms the public is likely to suffer).  The entire region has a strong interest in Noah's Ark implementing responsible safety protocols during the pandemic.

## II.     Noah's Ark Is Violating Its Common-Law Duty to Provide a Reasonably Safe Workplace.

The plant's deficient safety practices violate its common-law duty to provide a reasonably safe workplace.  This is an independent reason to order the four protections described above.

The duty to provide a safe workplace is well established in Nebraska and other states.  *See, e.g.*, *Whalen v. U.S. West Comms, Inc.*, 253 Neb. 334, 346 (1997) (describing employer's duty to "provide a reasonably safe place to work"); *Simon v. Omaha Public Power Dist.*, 189 Neb. 183, 191 (1972) ("[T]he notion of 'a safe place to work' has become an accepted component of Nebraska tort law in the employer-employee cases.") (collecting cases); *Lownes v. Furman*, 161

Neb. 57, 63 (1955) (same); *Poos v. Fred Krug Brewing Co.*, 101 Neb. 491, 163 N.W. 840, 841

(1917) (same); *see also DeSantiago v. Vickers, Inc.*, 2000 WL 872831, *3 (D. Neb. May 16, 2000)

(same) (quoting *Int'l Broth. of Elec. Workers, AFL-CIO v. Hechler*, 481 U.S. 851, 859 (1987));

*Mardis v. Miller*, 241 F. 470, 471 (8th Cir. 1917) (same); *see also Coming Attractions Bridal &*

*Formal, Inc. v. Tex. Health Res.*, 595 S.W.3d 659, 665 (Tex. 2020) (plaintiff properly stated claim

against hospital for "failing to protect its employees from the Ebola outbreak").

Breach of this duty occurs when an employer fails to "exercise[] ordinary and reasonable

care to maintain a safe workplace." *Buresh v. Reinke*, 28 Neb. App. 47, 60 (2020); *see Smith v.*

*Western Elec. Co.*, 643 S.W.2d 10, 13 (Mo. Ct. App. 1982) ("due care requires precautions which

a reasonably prudent employer would have taken"). In determining the standard of care, "expert

testimony may be helpful" but is not necessary where the breach is obvious. *Buresh*, 28 Neb. App.

at 60, 62-63.

Noah's Ark is breaching this duty for all the reasons described above. During the

coronavirus pandemic, a reasonable employer would not force its employees to work and eat in

such crowded conditions, or fail to replace wet and soiled masks, or keep sick people at work, or

provide no testing at all—and certainly not all of those at once. These failures make further

outbreaks at Noah's Ark highly "foreseeable"—in fact, the same failures have already led to

dozens of infections at the plant and at least one death. *Grano v. Long Island R.R. Co.*, 818 F.

Supp. 613, 618 (S.D.N.Y. 1993) ("An employer breaches its duty to provide a safe workplace

when it knows or should know of a potential hazard in the workplace, yet fails to exercise

reasonable care to inform and protect its employees.") (quotation marks omitted). And these

practices fall below the standard of other plants that are providing each of these protections and

more.  Lauritsen Decl. ¶¶ 10-25; *see Smith*, 643 S.W.2d at 13 (industry practices "may be evidence of what ought to be done").  Noah's Ark is failing any standard of reasonable care.

The plant's breach of this duty has already caused one wave of infections and now threatens to cause a new one.  In these circumstances, where "irreparable harm is otherwise likely to result" from an employer's lack of safety precautions, an "injunction [is] an appropriate remedy."  *Smith*, 643 S.W.2d at 13; *see, e.g.*, *Shimp v. New Jersey Bell Tel. Co.*, 145 N.J. Super. 516, 531 (Ch. Div. 1976) (ordering specific practices to "abate [a] hazard" that violated "employees' right to a safe working environment").  The plant's workers should not have to endure such elevated dangers just because their employer refuses to do the bare basics.[1]

### III.    Noah's Ark Is Violating the Families First Coronavirus Response Act.

By failing to pay adequate sick leave and prominently post its sick-leave policies, Noah's Ark is violating the Families First Coronavirus Response Act.  *See* Pub. L. No. 116-127 (Mar. 18, 2020); Pub. L. No. 116-136 (Mar. 27, 2020), *codified at* 29 U.S.C. § 2601 note.  Indeed, in May 2020, Noah's Ark was fined for violating the Act by failing to pay a worker for time spent in quarantine.  Mujahid Decl. ¶ 12, Ex. K.  Since then, Noah's Ark continues to violate the Act's leave and notice requirements.

The Act and its implementing regulations require both paid leave and notice to employees.  The leave provision requires employers to pay two weeks of sick leave to workers who stay home for a variety of COVID-related reasons, *see* Pub. L. No. 116-127 § 5102(a)-(b); 29 C.F.R. §

---

[1] As former Noah's Ark workers who remain close with their co-workers, Plaintiffs have standing to raise this claim.  Their co-workers face a significant and well-recognized impediment to raising this claim on their own, in the form of likely retaliation from their employer.  *See, e.g.*, *Hughes v. City of Cedar Rapids*, 840 F.3d 987, 992 (8th Cir. 2016) (recognizing third-party standing); *Camacho v. Brandon*, 317 F.3d 153, 160 (2d Cir. 2003) (finding third-party standing based on person's "fear of future retaliation"); *E.E.O.C. v. Wal-Mart Assocs., Inc.*, 2011 WL 8076831, at *8 (D.N.M. Oct. 26, 2011) (permitting non-employee to assert employee's workplace rights).

826.20(a)(1), including when the "employee is experiencing symptoms of COVID-19 and seeking a medical diagnosis," *id.* § 826.20(a)(1)(iii).  Employers cannot fire or otherwise discriminate against employees for taking this sick leave.  Pub. L. No. 116-127 § 5104(1).  Employees are entitled to paid leave if they have a fever, cough, shortness of breath, or any other COVID-19 symptom identified by the CDC.  *Id.* § 826.20(a)(4).  To ensure that employees with symptoms take this leave, the Act's notice provision requires employers to "post and keep posted, in conspicuous places on the premises," a "notice" describing the sick-leave rights provided by the Act.  Pub. L. No. 116-127 § 5103(a); 29 C.F.R. § 826.80(a).  The notice must also describe "the procedures for filing complaints of violations of [the Act] with the Wage and Hour Division."  *Id.*

Noah's Ark is violating the Act's leave requirement.  Plaintiffs Alma, Isabel, and Antonio have all experienced and witnessed people being allowed or pressured to keep working despite clear COVID-19 symptoms, instead of being allowed to take paid leave.  Alma Decl. ¶¶ 27-28, 33; Isabel Decl. ¶ 19; Antonio Decl. ¶ 18.  They also describe threats from Noah's Ark managers to fire workers who take sick leave, and refusals to pay workers who stayed home sick.  *Id.*; *see* Godinez Decl. ¶ 2, Ex. F-1 at 1.

Noah's Ark is also violating the Act's notice requirement.  None of the plaintiffs have seen a notice describing the Act's requirements anywhere in the plant.  Alma Decl. ¶ 26; Isabel Decl. ¶ 27; Antonio Decl. ¶ 29.  In fact, none of them had previously even heard of the Act.  *Id.*  The result is exactly what the notice is meant to prevent: Noah's Ark workers widely share the understanding—borne out by their own experience and that of their co-workers—that if they miss work because they feel sick, they will not be paid and might be fired.  Alma Decl. ¶¶ 30, 33; Isabel Decl. ¶ 28; Antonio Decl. ¶¶ 23, 29.

The Act is meant to provide workers one of the most basic protections against infection: ensuring that they are not exposed to sick co-workers. The Court should order the plant to comply with the Act.

## IV. The Remaining Preliminary Injunction Factors Favor an Injunction.

The deficient safety practices at Noah's Ark threaten to cause irreparable harm in the form of infections, hospitalizations, and deaths. *See Helling v. McKinney*, 509 U.S. 25, 33 (1993) ("[A] remedy for unsafe conditions need not await a tragic event.").

COVID-19 is a deadly virus that can cause severe illness and long-term complications in those it does not kill. Lemieux Decl. ¶¶ 9, 16-18. There is "no question" that "irreparable injury exist[s]" when the threatened harm is "a life threatening illness." *Harris v. Blue Cross Blue Shield of Mo.*, 995 F.2d 877, 879 (8th Cir. 1993); *see Kai v. Ross*, 336 F.3d 650, 656 (8th Cir. 2003) ("[T]he danger to plaintiffs' health, and perhaps even their lives, gives them a strong argument of irreparable injury."); *Henderson v. Bodine Aluminum, Inc.*, 70 F.3d 958, 961 (8th Cir. 1995) (similar). The practices at Noah's Ark uniquely threaten the Plaintiffs and their families, who have already experienced one outbreak at Noah's Ark, and whose continuing ties to Noah's Ark workers would put them directly in the path of another outbreak. Alma Decl. ¶¶ 5, 32; Isabel Decl. ¶¶ 18, 30; Antonio Decl. ¶¶ 18, 28. The same irreparable harm threatens all of the plant's workers, along with their families and communities, who face a dramatic increase in illness and suffering as a result of the conditions at Noah's Ark. *See* Mujahid Decl. ¶ 15, Ex. N (describing excess community infections and deaths traceable to meatpacking outbreaks).

Other kinds of irreparable harm are also likely without a preliminary injunction. Plaintiff Leonard faces threats to his safety as a doctor and serious risks to his business. Like other healthcare providers, he could face a new shortage of personal protective equipment in the hospital

where he works, and a shortage of equipment for treating patients.  Leonard Decl. ¶¶ 19-24.  As a business owner, he could lose staff members to infection, have to curtail his operations to limit the virus's spread, and be forced to divert resources to contact tracing and other precautions.  *Id.* ¶¶ 11-14, 23-25.  Countless other medical providers and business owners in the Tri-Cities would face similar harms if Noah's Ark fuels another spike in community transmission.

These risks, and therefore the urgency of an injunction, are growing as winter sets in and cases rise.  *See* Harrison Decl. ¶ 19.  Cold temperatures promote the spread of respiratory viruses like the one that causes COVID-19.  *Id.*  And rising case counts mean the odds are growing that the virus will reenter the plant soon.  When that happens, the only way to prevent another surge is for Noah's Ark to implement basic precautions against the rapid transmission.

An injunction would serve the public interest for similar reasons.  *See Freeman v. City of Dallas*, 242 F.3d 642, 652 (5th Cir. 2001) (noting "the public interest in nuisance abatement"); *Banks*, 468 F. Supp. 3d at 124 (noting public interest in an injunction that lowers COVID-19 risk and thereby "supports public health").  As explained, the practices at Noah's Ark threaten the public with its own irreparable harms: accelerated community transmission, increased infections and deaths, overwhelmed medical facilities, closed businesses and schools.  The entire Hastings and Tri-Cities region has an urgent interest in the requested injunction.  *See Seth*, 461 F. Supp. 3d at 263 (recognizing the public interest in "reducing the spread of this deadly virus in communal environments").

The harms to Plaintiffs and the public far outweigh any burdens on the plant.  The protections Plaintiffs seek are simple, feasible, and temporary.  Other meatpacking plants have implemented them, Lauritsen Decl. ¶¶ 10-25, as have countless other employers throughout the economy, Harrison Decl. ¶¶ 23, 28, 33, 35.  Businesses of all kinds have had to take special

measures to protect workers and the public during this deadly pandemic.  There is no reason that Noah's Ark cannot do its part and implement the most basic precautions.  Its workers should not have to fear for their lives every day they come to work, just because their employer will not take widely accepted steps to protect them.

To illustrate those steps, Plaintiffs have submitted a proposed order that lays out exactly how Noah's Ark can implement these four basic protections.  *See* Proposed Order Granting Preliminary Injunction, emailed to chambers.  The public interest and balance of equities favor abating this nuisance.

## CONCLUSION

The Court should grant Plaintiffs' motion for preliminary injunction.

Dated: December 3, 2020

Adam Sipple (SBN 20557)
Rose Godinez (SBN 25925)
ACLU Foundation of Nebraska, Inc.
134 S. 13th St. #1010
Lincoln, NE 68508
T: (402) 476-8091
*ajsipple@aclunebraska.org*
*rgodinez@aclunebraska.org*

Maren Lynn Chaloupka (SBN 20864)
Chaloupka Holyoke Snyder Chaloupka &
Longoria, P.C., L.L.O.
1714 2nd Avenue
P.O. Box 2424
Scottsbluff, NE 69363-2424
T: (308) 635-5000
F: (308) 635-8000
*mlc@chhsclaw.net*

*Attorneys for Plaintiffs*
*\*Admitted Pro Hac Vice*

Respectfully submitted,

/s/ Spencer Amdur
Spencer Amdur*
Julie Veroff*
ACLU Foundation
39 Drumm Street
San Francisco, CA 94111
T: (415) 343-0770
F: (415) 395-0950
*samdur@aclu.org*
*jveroff@aclu.org*

Lee Gelernt*
Noor Zafar*
ACLU Foundation
125 Broad Street, 18th Floor
New York, NY 10004
T: (212) 549-2660
F: (212) 549-2654
*lgelernt@aclu.org*
*nzafar@aclu.org*

26

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing brief complies with the type-volume limitation of NECivR 7.1(d) because it contains 8,326 words. I certify that I relied on Microsoft Word 2019 word count function, which included all text including the caption, headings, footnotes, and quotations.

/s/ Spencer Amdur
Spencer Amdur

**CERTIFICATE OF SERVICE**

I hereby certify that on December 3, 2020, I electronically filed the foregoing with the Clerk of Court by using the District Court CM/ECF system. A true and correct copy of this brief has been served via the Court's CM/ECF system on all counsel of record. This brief will also be mailed to Defendant via overnight mail.

/s/ Spencer Amdur
Spencer Amdur

27