**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEBRASKA**
**LINCOLN DIVISION**

| | |
|---|---|
| ALMA, et al., | ) |
| *Plaintiffs*, | ) Case No.: 4:20-cv-03141 |
| v. | ) **PLAINTIFFS' BRIEF IN** |
| NOAH'S ARK PROCESSORS, LLC, | ) **OPPOSITION TO DEFENDANT'S** |
| | ) **MOTION TO DISMISS** |
| *Defendant*. | ) |

Defendant's motion to dismiss largely repeats its arguments in opposition to the preliminary injunction. Dkt. 51 ("MTD Br."). It argues that Plaintiffs lack Article III standing, special injury, causes of action, and that the case should be dismissed under the primary jurisdiction doctrine. *See* PI Opp., Dkt. 28 (same arguments). Plaintiffs have responded to those arguments in their preliminary injunction briefing, and for the Court's convenience, will not repeat all of their responses here. *See* PI Reply, Dkt. 40 at 13-21. Rather, in this brief, Plaintiffs respond to the few additional arguments raised in Defendant's motion to dismiss.

## BACKGROUND

The factual allegations in the Complaint are summarized in detail in Plaintiffs' preliminary injunction briefs. In short, Plaintiffs allege that Noah's Ark—the largest meatpacking plant in Hastings, Nebraska—has failed to take the most basic and critical steps to protect its workers and the community from a surge in COVID-19 cases originating at the plant. The plant already had one large outbreak and at least one death in April and May, during which the infection and death rates in Adams County skyrocketed above neighboring counties without meatpacking plants.

1

Outbreaks at hundreds of other meatpacking plants have similarly caused severely accelerated community spread. *See* Compl. ¶ 1-11, 21-26.

There is no doubt as to what precautions are necessary to protect against further large outbreaks at meatpacking plants. Doctors, researchers, public health officials, and agencies like the Centers for Disease Control and Prevention have identified four practices that are absolutely essential to prevent widespread infection in the crowded indoor setting of a meatpacking plant: social distancing of at least six feet, universal mask use, paid leave policies for sick workers that are clearly communicated, and testing programs to identify both symptomatic and asymptomatic cases. Without these protections, rapid transmission within the plant and community is all but inevitable. *See* Compl. ¶ 33-48, 81-91.

Noah's Ark has utterly failed to abide by these basic standards. Extreme crowding persists in its processing areas and cafeteria; workers are mere inches apart for hours at a time. Workers must frequently lower or remove their masks because the plant does not promptly replace masks that quickly become soiled with blood, fat, and sweat. The plant still has no written policies or protocols to ensure that unwearable masks are promptly replaced. The plant has no written sick leave policy, and has made virtually no effort to inform employees that they will get paid if they stay home sick. In fact, the plant has pressured sick workers to stay at work, putting their co-workers at enormous risk. As a result, workers widely understand that they cannot miss work even if they have COVID-19 symptoms. Finally, the plant is not conducting any testing or contact tracing; at most, when a worker has a fever, the plant sends the worker to find a test on their own in the community. Other plants are providing these protections. Yet Noah's Ark persists in its failure to take responsible action to protect workers and the community. *See* Compl. ¶ 49-80.

**STANDARD OF REVIEW**

"In analyzing a motion to dismiss, a court must accept the allegations contained in the complaint as true and make all reasonable inferences in favor of the nonmoving party." *Martin v. Iowa*, 752 F.3d 725, 727 (8th Cir. 2014).

**ARGUMENT**

**I.    Plaintiffs Have Standing.**

Defendant recycles its standing arguments from the preliminary injunction. PI Opp., Dkt. 33 at 13-21. They are meritless for the reasons Plaintiffs have explained. Plaintiffs face a wide array of injuries if the plant does not adopt the most critical infection-control practices. Another outbreak at Noah's Ark would make local infection rates skyrocket, just like last time Noah's Ark had an outbreak. PI Reply 16-18. An outbreak would put Plaintiffs and their families at acute risk of contracting COVID-19, because they live in the same community as their former co-workers, go to the same churches and grocery stores, and Dr. Leonard personally treats the family members of Noah's Ark workers. *Id.*; Alma Supp. Decl., Dkt. 39-1 ¶ 2, 9-10; Isabel Supp. Decl., Dkt. 39-2 ¶ 4-5; Antonio Supp. Decl., Dkt. 39-3 ¶ 9-10.[1] An outbreak would close businesses and schools in Plaintiffs' neighborhoods. *Id.* Dr. Leonard's business would face a number of unique harms to its operations and revenue, and he would face a shortage of PPE and medical equipment. Leonard Decl., Dkt. 19-5 ¶ 10-15, 18, 20-23, 25. The Doe Plaintiffs would face the unique distress of seeing their friends and neighbors experience another outbreak like the one Plaintiffs already

---

[1] The Court can consider Plaintiffs' preliminary injunction declarations at this stage because they are consistent with the Complaint and flesh out its allegations. *See State ex rel. Nixon v. Coeur D'Alene Tribe*, 164 F.3d 1102, 1107 (8th Cir. 1999) (court can consider record materials that "do not contradict the complaint"); *Miller v. Redwood Toxicology Lab., Inc.*, 688 F.3d 928, 931 & n.3 (8th Cir. 2012) (considering preliminary injunction allegations that fleshed out the complaint).

experienced with them. *Id.*[2] These multiple and serious injuries are more than enough to give Plaintiffs standing.

In addition, Defendant asks the Court to take judicial notice of the fact that COVID-19 vaccines have recently received emergency approval. MTD Br. 14. Plaintiffs do not oppose that request, but it does nothing to undermine Plaintiffs' standing. Vaccine rollout has been slow, and it could be months before the government begins—much less finishes—administering the vaccine to meatpacking workers. Multiple outbreaks could happen at Noah's Ark during these months. Indeed, the first outbreak at Noah's Ark and spike in Adams County happened within weeks of the virus being detected in Nebraska. Compl. ¶ 4, 23. The vaccine thus does nothing to decrease the urgency of this case.

## A. Article III

Defendant persists in arguing that Plaintiffs lack Article III standing. MTD Br. 7-13 (quoting basic standing principles); *id.* at 13-16 (arguments). It makes two main Article III arguments: that the injuries Plaintiffs face are not "particularized" or "personal," MTD Br. 13; and that the injuries are too speculative, *id.* at 15. Both are wrong.

First, Plaintiffs' physical, emotional, and economic injuries are about as "personal" and "concrete" as it gets. Defendant misunderstands what standing cases mean when they use these words. MTD Br. 13 (arguing no standing because "all members of the public" would also be injured). The cases simply hold that a plaintiff cannot assert a "generalized" interest in "proper

---

[2] Defendant suggests that Plaintiffs can avoid injury just by wearing masks and avoiding Noah's Ark workers, their family members, and their other contacts. MTD Br. 14. That ignores Plaintiffs' economic and emotional injuries, as well as injuries arising from the closure of businesses, schools, and places of worship—none of which rely on physical contact with Plaintiffs. In any event, as Plaintiffs have explained, masks alone cannot prevent transmission, nor can Plaintiffs and their families avoid contact at their places of work, school, commerce, and worship.

4

application of the Constitution and laws," when the action they challenge has no personal effect on them. *Hollingsworth v. Perry*, 570 U.S. 693, 706 (2013). But when an action threatens a plaintiff's health, family, business, or any other personal interest, the plaintiff has standing *regardless* of how many other people the action would injure. *See United States v. SCRAP*, 412 U.S. 669, 687 (1973); *Friends of the Earth v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 154 (4th Cir. 2000) (en banc) (same). That is why plaintiffs can challenge all kinds of actions that harm thousands of others the same way they harm the plaintiffs. *See, e.g.*, *United States v. Metropolitan St. Louis Sewer Dist.*, 883 F.2d 54, 56 (8th Cir. 1989) (pollution of water that plaintiffs "visit, cross, and frequently observe"); *Baur v. Veneman*, 352 F.3d 625, 637 (2d Cir. 2003) (national regulations that cause "increase in the risk of disease"); *Harvey v. Veneman*, 396 F.3d 28, 34 (1st Cir. 2005) (policy that "degrades the quality of organically labelled foods" nationally).

Second, Noah's Ark claims that the injuries Plaintiffs assert are too speculative. MTD Br. 14-15. But as Plaintiffs allege (and Defendant does not dispute), there was *already* a large outbreak at Noah's Ark and the surrounding community; hundreds of meatpacking plants have had similar outbreaks, which have universally led to spikes in community spread; these outbreaks continue; and the conditions Plaintiffs allege are precisely the ones that have made these plants such hotspots. PI Br., Dkt. 18 at 3-4, 19-20; Compl. ¶¶ 2-10, 22-26, 33-48. Defendant's brief ignores all of this, and it ignores the Plaintiffs' ongoing personal connections to Noah's Ark and its workers. Defendant's causation arguments bear little discussion. It suggests "[i]t is possible that" no infected person will ever again enter the plant, MTD Br. 14, even as case counts climb and the plant conducts no screening tests. It mentions that "Plaintiffs may possibly contract the virus" elsewhere, *id.*, but that bare speculation has no impact on the threat they face here. It suggests that

"infected Noah's Ark workers" may immediately "take sick leave" and "quarantine," *id.* at 15, ignoring the prevalence of asymptomatic spread, and ignoring the fact that the plant has no sick leave policy. And it asserts that eventual vaccination will reduce the threat, *id.*, but Noah's Ark workers are not vaccinated and may not be for months. The plant's failures to reduce crowding, test its workers, offer sick leave, and replace masks create at the very least "a substantial risk that the harm will occur." *In re SuperValu, Inc.*, 870 F.3d 763, 769 (8th Cir. 2017) (quotation marks omitted).

The Court should reject the plant's attempt to avoid accountability for its failure to take basic precautions against this deadly disease. MTD Br. 14 ("[T]he infection did not originate at Noah's plant; it came from China."). Its Article III arguments, if correct, would mean that *no one* would have standing to challenge its safety failures, no matter how egregious. Since the failures put thousands in the community at risk, according to the plant, no one could ever have a "particularized" injury. MTD Br. 13. And because it is always "possible" a plant outbreak "will not occur," any claim would necessarily be too speculative. MTD Br. 14. That would mean that no plaintiff could ever hold Noah's Ark accountable for its endangerment of workers and the surrounding community.

### B. Special Injury

Defendant argues that Plaintiffs—recent Noah's Ark workers with close ties to current workers, and a doctor who treats the families of Noah's Ark workers—face the same injuries as the general public, and therefore cannot bring a public nuisance claim. MTD Br. 18-22. Plaintiffs have already explained why that is wrong. PI Reply 16-18.

As the Nebraska Supreme Court has explained, an injury qualifies as a special injury as long as it is not "identical with that of the public." *Karpisek v. Cather & Sons Const., Inc.*, 174

6

Neb. 234, 241 (1962). In *Karpisek*, for instance, the Court held that nearby residents could challenge emissions from an asphalt plant that were endangering public health. It acknowledged that "a considerable number" of other residents would suffer the same kind of harm. *Id.* But because others in the "larger community . . . suffered nothing whatever" from the emissions, the plaintiffs faced special injury that was not "identical" to the community's. *Id.*

Plaintiffs face numerous injuries that are not "identical with that of the public." As Defendant acknowledges, members of the public who are already vaccinated "face no material risk of infection traceable to Noah's [Ark]." MTD Br. 14. That alone gives Plaintiffs special injury under *Karpisek*. Further, as explained, Dr. Leonard faces a PPE shortage, the stress of being flooded with COVID-19 patients, and major changes to his medical practice, none of which the general public shares. PI Reply 17. Defendant does not respond to Dr. Leonard's unique personal injuries. Regarding his business, Defendant suggests there is no special injury where "many businesses have suffered," MTD Br. 21 (quoting out-of-state case), but *Karpisek* forecloses that theory, 174 Neb. at 241 ("The number of persons who are specially injured by a nuisance does not" matter in Nebraska.).[3] Alma, Isabel, and Antonio face unique emotional injuries from seeing their friends and neighbors experience another deadly outbreak at Noah's Ark. PI Reply 18.

---

[3] The Restatement lists dozens of cases finding special injury based on injuries to a business. *See* Restatement (Second) of Torts § 821C cmt. h, Pecuniary Loss (citing 47 cases). As one court explained in a case involving "profound damage common to [an] entire community," "the breadth and depth of the tragedy do not preclude a determination that a peculiar or special harm has also been done to these plaintiffs; diminution or loss of livelihood is not suffered by every person" affected by the nuisance. *Leo v. Gen. Elec. Co.*, 145 A.D.2d 291, 294 (N.Y. App. Div. 1989). Defendant cites a single case in which the plaintiff itself alleged that literally every "retail establishment[]" in the community had suffered the exact same injury. *Neb. Innkeepers, Inc. v. Pittsburgh-Des Moines Corp.*, 345 N.W.2d 124, 130 (Iowa 1984). This case involves no such concession. To the contrary, Dr. Leonard's loss of well-child visits and diversion of resources to contact tracing are plainly not shared by most businesses in the Tri-Cities area, and plenty of businesses, like delivery and online services, face no injury at all from a plant outbreak.

7

Defendant responds without authority or explanation that emotional injuries are not cognizable at all, but that is clearly wrong. PI Reply 18.[4] Finally, all Plaintiffs face elevated risks of physical injury, which courts have consistently held *ipso facto* counts as special injury. PI Reply 18. Defendant does not respond.

These close connections between Plaintiffs and the plant eliminates any concern that "every subject in the kingdom" could sue Noah's Ark. MTD Br. 19 (quotation marks omitted). Plaintiffs treat Noah's Ark families, worked at Noah's Ark throughout the pandemic, endured its first outbreak, and maintain close personal ties to its current workers. They have a much closer relationship to the plant than undifferentiated members of the general public.

### C. Third-Party Standing

As Plaintiffs have explained, they have third-party standing to assert their safe-workplace claim. PI Reply 19-20 (explaining that third-party standing requires an injury in fact, a close relation to the third party, and a hindrance faced by the third party).

Defendant responds in a footnote. MTD Br. 12 n.11. It asserts that Plaintiffs have no injury in fact, which is wrong as explained above. It contests Plaintiffs' close relation to current workers solely on the ground of a supposed "conflict of interest," *id.*, but it identifies no such conflict, and it is hard to see how current workers could be *harmed* by the basic safety practices Plaintiffs seek. The plant contests hindrance solely by arguing that workers could bring suit if Noah's Ark retaliates against them. *Id.*; *but see* Dkt. 2 at 2, 6 (collecting evidence of widespread

---

[4] *See, e.g.*, *Ileto v. Glock Inc.*, 349 F.3d 1191, 1212 (9th Cir. 2003) ("emotional injuries" were special injury for public nuisance); *Wilson v. Parent*, 228 Or. 354, 367 (1961) (similar); *Crawford v. Nat'l Lead Co.*, 784 F. Supp. 439, 445 (S.D. Ohio 1989) ("Emotional distress" is a "cognizable injur[y] giving rise to a cause of action for nuisance."); *Cons. Rail Corp. v. Gottshall*, 512 U.S. 532, 544 (1994) ("Nearly all of the States have recognized a right to recover" for certain "emotional distress."); *Hobbs v. Lockhart*, 46 F.3d 864, 868 (8th Cir. 1995) (holding that "emotional distress" is "constitutionally cognizable").

retaliation fears). But that hardly eliminates the "economic disincentives" faced by low-wage workers at Noah's Ark who would have to hire a lawyer and pay for years of litigation in hopes of eventual redress. *Campbell v. Louisiana*, 523 U.S. 392, 400 (1998). The Supreme Court and Eighth Circuit have rejected Defendant's theory, holding that "the economic burdens of litigation" are *themselves* a sufficient hindrance to allow third-party standing. *Hodak v. City of St. Peters*, 535 F.3d 899, 904 (8th Cir. 2008) (quoting *Powers v. Ohio*, 499 U.S. 400, 414-15 (1991)).

## II. Plaintiffs' Causes of Action Are Valid.

### A. Public Nuisance

Defendant repeats its strange claim that only criminal violations can be public nuisances. MTD Br. 21-22. That ignores dozens of cases in Nebraska and hundreds across other states finding public nuisances without any suggestion of criminal activity.[5] PI Reply 20 (citing cases); Restatement (Second) of Torts § 821B (to be a public nuisance, conduct need not "have already been proscribed by the state as criminal"); 2 Am. Jur. 2d *Nuisances* § 29 ("Conduct that unreasonably and significantly interferes with the public health . . . is a public nuisance within the concept of tort law even if that conduct is not specifically prohibited by the criminal law.").

Defendant's misunderstanding appears to be rooted in two unrelated concepts. First, criminal conduct *can* be a nuisance by merit of its criminality—this is often called a "nuisance per

---

[5] Examples are far too numerous to list. *See, e.g.*, *Karpisek*, 174 Neb. at 234 (finding public nuisance with no analysis of whether conduct violated the criminal law); *State ex rel. Carlson v. Hatfield*, 183 Neb. 157 (1968) (same); *Letherman v. Hauser*, 110 N.W. 745 (Neb. 1906) (same); *Village of Kenesaw v. Chicago, B. & Q.R. Co.*, 136 N.W. 990, 991 (Neb. 1912) (analyzing nuisance *after* concluding there was no "ordinance prohibiting" the conduct); *State ex rel. Towle v. Eyen*, 264 N.W. 901 (Neb. 1936) (same); *County of York v. Tracy*, 5 Neb. App. 240, 252-55 (Neb. Ct. App. 1996) (same); *People v. ConAgra Grocery Prods. Co.*, 17 Cal. App. 5th 51, 114 (2017) (holding that criminal violation not required); *Armory Park Neighborhood Ass'n v. Episcopal Comm. Serv. in Ariz.*, 148 Ariz. 1, 9-10 (1985) (en banc) (same); *City of Gary ex rel. King v. Smith & Wesson Corp.*, 801 N.E.2d 1222, 1232-35 (Ind. 2003) (same).

se." *See, e.g.*, *State ex rel. Spire v. Strawberries*, 239 Neb. 1, 9 (1991) (explaining that a statutory violation "*may* sustain" a nuisance finding—not that such violation is required). But criminality is not required; in the absence of a "nuisance per se," there can still be a "nuisance in fact" if a defendant's conduct interferes with public health or other public rights. *Botsch v. Leigh Land Co.*, 195 Neb. 509, 513-14 (1978); *see, e.g.*, *State ex rel. Towle v. Eyen*, 264 N.W. 901, 902 (Neb. 1936) (conduct was a public nuisance even though it did not violate any law and therefore "would not amount to a nuisance per se"); *Andrew v. Village of Nemaha*, 2017 WL 2774067, *11 (Neb. Ct. App. June 27, 2017) (unpublished) (explaining the difference between a "nuisance per se" and a "nuisance in fact" in the context of public nuisance) (quotation marks omitted). Second, in early common law, public nuisances were treated as criminal offenses prior to the abolishment of common-law crimes; now they are treated as torts. *See In re Lead Paint Litig.*, 924 A.2d 484, 495 (N.J. 2007) (explaining the history). But they never required a violation of some *separate* criminal enactment.

### B. Safe Workplace

Defendant repeats its bare-bones argument that Plaintiffs cannot bring their safe-workplace claim until they have already suffered the injuries they seek for prevent. MTD Br. 22-23. But Defendant ignores the allegations that its continuing failures already *have* caused injury to the Plaintiffs and the community in the form of a COVID-19 outbreak. Compl. ¶ 23, 67, 84, 89. Even on Defendant's theory, the Court can remedy a continuing violation that has already caused injury.[6]

---

[6] Defendant briefly asserts that workers' compensation laws would bar a claim to redress "past" injuries Plaintiffs experienced at Noah's Ark. MTD Br. 6 n.4, 17 n.13. That assertion is irrelevant, because Plaintiffs here are only seeking an injunction to prevent *future* injuries. The workers' compensation laws do not address or preempt such claims because they only address "compensation" for past injuries. Neb. Stat. § 48-101, 48-111, 48-161; *see, e.g.*, *Anthony v. Pre-Fab Transit Co.*, 239 Neb. 404, 411 (1991) ("No Nebraska statute grants equity jurisdiction to the Worker's Compensation Court."); *Marlow v. Maple Manor Apts.*, 193 Neb. 654, 658 (1975)

In any event, as Plaintiffs have explained, it is axiomatic that plaintiffs can sue to enjoin threatened torts before the injury occurs, and multiple courts have issued safe-workplace injunctions to prevent future injury. PI Reply 20 (collecting cases); *see also* Neb. Stat. § 25-1063 (providing that under Nebraska law, courts can issue injunctions whenever the "continuance of [defendant's conduct] during the litigation would produce great or irreparable injury to the plaintiff"). Defendant does not address these cases or principles. It cites two inapposite cases involving damages claims only, which simply held that plaintiffs could not seek *damages* before suffering injury. MTD Br. 22 (citing *Bittner v. Miller*, 226 Neb. 206, 212 (1987); *St. Paul Fire & Marine Ins. Co. v. Touche Ross & Co.,* 234 Neb. 789 (1990)). And it cites a case that dismissed a safe-workplace claim without addressing most of the cases Plaintiffs have cited, and with no discussion of the principle that "[i]t is not necessary [] to prove past wrong" when a "threatened tort" is imminent. Restatement (Second) of Torts § 933 cmt. b; *contra* MTD Br. 22 (citing *Rural Cmty. Workers All. v. Smithfield Foods*, 459 F.Supp.3d 1228 (W.D. Mo. 2020)).

### C. Families First Coronavirus Response Act

As Plaintiffs have explained, they are no longer pressing their claim under the Families First Coronavirus Response Act now that the Act has expired. Dkt. 47. This does not affect the sick-leave aspects of Plaintiffs' nuisance and safe-workplace claims, because without paid sick leave, clearly communicated to workers, sick people will inevitably keep working—all but

---

("[W]e cannot believe the Legislature intended to take away from employees rights of actions which are not within the coverage of the Workmen's Compensation Act."); *Schweitzer v. Am. Nat'l Red Cross*, 256 Neb. 350, 360 (1999) (Act does not affect negligence claim "not derived from the Act"); *see also, e.g.*, *Olivares v. Performance Contracting Grp.*, 2005 WL 3479817, *3 (Mich. Ct. App. Dec. 20, 2005) ("claim for injunctive relief was not the type of claim seeking compensation that is within the Worker's Compensation Agency's exclusive jurisdiction"); *Johnson v. First Union Corp.*, 496 S.E.2d 1, 5 (N.C. Ct. App. 1998) (same); *Hicks v. Allegheny E. Conf. Ass'n of Seventh Day Adventists, Inc.*, 712 A.2d 1021, 1022 (D.C. App. 1998) (same).

ensuring the rapid spread of the virus. Compl. ¶ 40-42. Indeed, now that the Act has expired, Noah's Ark has *no sick-leave policy at all*, as Plaintiffs allege and the plant has confirmed. Compl. ¶ 70-72; Antonio Decl., Dkt. 19-4 ¶ 24; PI Reply 10-12 (plant's only "policy" was a one-page online printout about the Act, which was at most posted in English for a couple weeks in December). The plant's failure to offer paid sick leave or communicate its availability to workers poses an extreme threat of widespread harm.

### III.   Primary Jurisdiction Is Inappropriate Here.

Defendant's brief says almost nothing about primary jurisdiction. MTD Br. 23-24. It cites two cases, both of whose primary jurisdiction holdings are inapplicable here as Plaintiffs have explained. PI Reply 13-15. Unlike in those cases, OSHA has refused to take any meaningful action at Noah's Ark for nearly five months, despite receiving multiple urgent complaints. Even if OSHA issued an abatement order against Noah's Ark tomorrow, there is no chance the order would take effect during the pandemic.[7] OSHA has moreover disclaimed any desire for uniformity by declining to issue any COVID-19 rules for meatpacking. And its expertise is not needed here, because, unlike in the cases Defendant cites, there is no dispute in this case about the necessity of the protections Plaintiffs are seeking. It's hard to imagine a worse fit for the primary jurisdiction doctrine. Invoking it here would guarantee that Plaintiffs and the public have no redress against

---

[7] *See, e.g.*, *SeaWorld of Florida, LLC v. Perez*, 748 F.3d 1202, 1205 (D.C. Cir. 2014) (abatement order affirmed four years after it was issued); *Fabi Constr. Co., Inc. v. Sec'y of Labor*, 508 F.3d 1077 (D.C. Cir. 2007) (three years); *A.E. Stanley Mfg. Co. v. Sec'y of Labor*, 295 F.3d 1341 (D.C. Cir. 2002) (eleven years); *Donovan v. Royal Logging Co.*, 645 F.2d 822, 824-25 (9th Cir. 1981) (six years). The relevant statutes and regulations provide that employers can contest abatement orders first in a trial before an administrative law judge, then on appeal to an administrative commission, then at the court of appeals. *See* 29 U.S.C. §§ 659(c), 660(a)-(b), 661(j); 29 C.F.R. Part 2200; Felson Decl., Dkt. 39-5 ¶ 6-9.

Noah's Ark. And dismissing the case would only encourage the plant to drop the new "plans" it claims to have developed in response to this lawsuit. Dkt. 53 at 8 (still just "plans").

Other courts have rejected primary jurisdiction in similar circumstances. *See St. Louis Cty. v. House of Pain Gym Serv*s., 2020 WL 2615746, *2 (E.D. Mo. May 22, 2020) (rejecting primary jurisdiction in COVID-19 nuisance case because the court was "certainly capable of rendering a decision regarding whether Defendants are engaged in a public nuisance"). This Court should do the same.

Dated: January 20, 2021

Respectfully submitted,

Adam Sipple (SBN 20557)
Rose Godinez (SBN 25925)
ACLU Foundation of Nebraska, Inc.
134 S. 13th St. #1010
Lincoln, NE 68508
T: (402) 476-8091
*ajsipple@aclunebraska.org*
*rgodinez@aclunebraska.org*

/s/ Spencer Amdur
Spencer Amdur*
ACLU Foundation
39 Drumm Street
San Francisco, CA 94111
T: (415) 343-0770
F: (415) 395-0950
*samdur@aclu.org*

Maren Lynn Chaloupka (SBN 20864)
Chaloupka Law LLC
P.O. Box 1724
Scottsbluff, NE 69363
T: (308) 270-5091
F: (308) 270-5105
*mlc@chaloupkalaw.net*

Lee Gelernt*
Noor Zafar*
ACLU Foundation
125 Broad Street, 18th Floor
New York, NY 10004
T: (212) 549-2660
F: (212) 549-2654
*lgelernt@aclu.org*
*nzafar@aclu.org*

*Attorneys for Plaintiffs*
*\*Admitted Pro Hac Vice*

## CERTIFICATE OF SERVICE

I hereby certify that on January 20, 2021, I electronically filed the foregoing with the Clerk of Court by using the District Court CM/ECF system. A true and correct copy of this motion has been served via the Court's CM/ECF system on all counsel of record.

/s/ Spencer Amdur
Spencer Amdur

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with the type-volume limitation of NECivR 7.1(d) because it contains 4,191 words. I certify that I relied on Microsoft Word 2019 word count function, which included all text including the caption, headings, footnotes, and quotations.

/s/ Spencer Amdur
Spencer Amdur