IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| ALMA, et al., | |
| Plaintiffs, | 4:20-CV-3141 |
| vs. | MEMORANDUM AND ORDER |
| NOAH'S ARK PROCESSORS, LLC, | |
| Defendant. | |

The defendant in this case, Noah's Ark Processors, LLC, operates a meat processing facility in Hastings, Nebraska. *See* filing 1 at 2, 4. According to the plaintiffs, Noah's Ark has not taken measures needed to protect its employees from COVID-19. *See* filing 1. But the plaintiffs are not employees of Noah's Ark—instead, they're *former* employees, along with a local doctor. *See* filing 1 at 3-5. While the Court does not question their sincere concern for the well-being of Noah's Ark's employees, the Court finds that they lack standing to assert the claims they have alleged, and will dismiss their complaint.

BACKGROUND

There are four plaintiffs in this case, and three of them are proceeding under pseudonyms. *See* filing 20. Alma lives in Grand Island, Nebraska and worked for Noah's Ark until fall 2020, "when she quit because of poor working conditions." Filing 1 at 4. Isabel and Antonio also live in Grand Island and worked at Noah's Ark until last year. Filing 1 at 4-5. All three former employees "remain[] in close touch with workers at the plant." Filing 1 at 4-5. The named plaintiff, Dr. Daniel J. Leonard, is a doctor in Hastings who

practices pediatrics. Filing 1 at 5. He treats the children of meat processing facility workers, and people afflicted with COVID-19. Filing 1 at 5.

The plaintiffs sued Noah's Ark late last year—after all of the former employees had left their employment with Noah's Ark—alleging that Noah's Ark was not taking needed precautions to protect its workforce and the community at large from COVID-19, and that Adams County and Hall County had COVID-19 outbreaks more serious than neighboring counties.[1] *See* filing 1. They asserted state-law claims for public nuisance and negligence and a federal claim purporting to arise from the Families First Coronavirus Response Act, Pub. L. No. 116-127, 134 Stat 178-220 (2020). They also sought a preliminary injunction ordering Noah's Ark to take the safety measures they thought necessary. *See* filing 17. In response, Noah's Ark moved to dismiss the plaintiffs' complaint pursuant to Fed. R. Civ. P. 12(b) for, among other things, lack of standing.

## STANDARD OF REVIEW

A motion pursuant to Rule 12(b)(1) challenges whether the court has subject matter jurisdiction. Rule 12(b)(1) motions can be decided in three ways: at the pleading stage, like a Rule 12(b)(6) motion; on undisputed facts, like a summary judgment motion; and on disputed facts. *Jessie v. Potter*, 516 F.3d 709, 712 (8th Cir. 2008).

A court deciding a motion under Rule 12(b)(1) must distinguish between a "facial attack'" and a "factual attack." *Branson Label, Inc. v. City of Branson,*

---

[1] Hastings and Grand Island are closely neighboring cities in Central Nebraska. Grand Island, where several of the plaintiffs live, is a city of just over 50,000 located in Hall County. Hastings, where Dr. Leonard practices and where Noah's Ark's has its facility, is a city of about 25,000 located in Adams County roughly 20 miles south of Grand Island.

*Mo.*, 793 F.3d 910, 914 (8th Cir. 2015). In a facial attack, the Court merely needs to look and see if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction. *Id.* Accordingly, the Court restricts itself to the face of the pleadings and the non-moving party receives the same protections as it would defending against a motion brought under Rule 12(b)(6)—that is, the Court accepts all factual allegations in the pleadings as true and views them in the light most favorable to the nonmoving party. *Id.*; *Hastings v. Wilson*, 516 F.3d 1055, 1058 (8th Cir. 2008).

Conversely, in a factual attack, the existence of subject matter jurisdiction is challenged in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, may be considered. *Branson Label*, 793 F.3d at 914. Thus, the nonmoving party would not enjoy the benefit of the allegations in its pleadings being accepted as true by the reviewing court. *Id.* But factual challenges do not arise only when a court considers matters outside the pleadings. *Faibisch v. Univ. of Minnesota*, 304 F.3d 797, 801 (8th Cir. 2002). A district court engages in a factual review when it inquires into and resolves factual disputes. *Id.*

Although Noah's Ark did not present evidence in support of its motion to dismiss, the plaintiffs have pointed to evidence they adduced in support of their motion for preliminary injunction as also supporting their standing to sue. *See* filing 40 at 16-20. So at least technically, this case presents a factual attack, but the Court doesn't understand the facts—at least as relevant to standing—to be disputed. *See* filing 51 at 13-18. Accordingly, the Court will resolve this case on the complaint supplemented by undisputed facts evidenced in the record. *See Johnson v. United States*, 534 F.3d 958, 962 (8th Cir. 2008).[2]

---

[2] The Court recognizes that prudential standing, discussed below, may not implicate the Court's jurisdiction, *see June Med. Servs. L. L. C. v. Russo*, 140 S. Ct. 2103, 2117-18 (2020),

- 3 -

DISCUSSION

The jurisdiction of federal courts is limited to "cases" and "controversies," *see* U.S. Const., Art. III, § 2, and standing to sue is a doctrine rooted in the traditional understanding of a case or controversy, *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). The doctrine developed to ensure that federal courts do not exceed their authority, and limits the category of litigants who may maintain a lawsuit in federal court to seek redress for a legal wrong. *Id*. Plaintiffs must have "such a personal stake in the outcome of the controversy as to justify the exercise of the court's remedial powers on their behalf. *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017).

The "irreducible constitutional minimum" of Art. III standing consists of three elements: the plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. *Spokeo*, 136 S. Ct. at 1547; *Glickert v. Loop Trolley Transp. Dev. Dist.*, 792 F.3d 876, 881 (8th Cir. 2015). The plaintiff, as the party invoking federal jurisdiction, has the burden to establish these elements. *Spokeo*, 136 S. Ct. at 1547.

The "first and foremost" of these three elements is the existence of an "injury in fact": a plaintiff must show that he or she suffered an invasion of a legally protected interest that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Id*. at 1548; *see Trump v. New York*, 141 S. Ct. 530, 535 (2020); *Carney v. Adams*, 141 S. Ct. 493, 498 (2020). For an injury to be "particularized," it "must affect the plaintiff in a personal and

---

posing the question whether Rule 12(b)(1) (and its authority to consider evidence beyond the pleadings) is the right procedural vehicle to decide the issue. But neither party has objected to the Court addressing standing in this procedural posture. *See* filing 56 at 3 n.8.

individual way. *Spokeo*, 136 S. Ct. at 1548. And a "concrete" injury must actually exist. *Id*.

In analyzing standing, the Supreme Court has repeatedly found that a plaintiff lacks standing to sue when the plaintiff cannot demonstrate specific injuries. *Pucket v. Hot Springs Sch. Dist. No. 23-2*, 526 F.3d 1151, 1160 (8th Cir. 2008). In other words, for a federal court to have authority under the Constitution to settle a dispute, the party before it must seek a remedy for a personal and tangible harm: "the presence of a disagreement, however sharp and acrimonious it may be, is insufficient by itself to meet Art. III's requirements." *Hollingsworth v. Perry*, 133 S. Ct. 2652, 2661 (2013). The "injury in fact" test requires more than an injury to a cognizable interest—it requires that the party seeking review be himself among the injured. *Lujan v. Defs. of Wildlife*, 112 S. Ct. 2130, 2137 (1992).

The plaintiffs' alleged injuries are neither concrete nor particularized: the gist of their claim to standing is that there could be another COVID-19 outbreak at Noah's Ark, and that could cause widespread disease in the community in which they live, and that could endanger them and affect the community. *See* filing 40 at 16. But implicit in their argument is that (1) their interests are the same as the rest of their community, and (2) their interests are diffuse and derivative, depending on a sequence of causation that is nearly impossible to predict or assess. And a plaintiff cannot establish standing by asserting an abstract general interest common to all members of the public, no matter how sincere or deeply committed a plaintiff is to vindicating that general interest on behalf of the public. *Carney*, 141 S. Ct. at 499.

Similarly, the injuries the plaintiffs allege are neither actual nor imminent. They seek no damages for past conduct, *see* filing 1 at 23, and their predictions of what *could* happen in the absence of injunctive relief fall short

of describing an imminent injury. To be sure, a future injury may be sufficiently actual or imminent "if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2565 (2019); *see Park v. Forest Serv. of U.S.*, 205 F.3d 1034, 1037 (8th Cir. 2000). But a theory of standing "which relies on a highly attenuated chain of possibilities" does not suffice. *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1148 (2013); *see Shain v. Veneman*, 376 F.3d 815, 818 (8th Cir. 2004). The plaintiffs claim precisely such a chain of possibilities, and "[i]f the plaintiffs [in this case] have alleged a cognizable injury, then as [a] practical matter, any plaintiff who conceivably could be harmed by a defendant's conduct would possess standing to sue in federal court." *Shain*, 376 F.3d at 818.

In addition to lacking an injury in fact, the plaintiffs' claims fall short of establishing traceability and redressability—a problem that's actually exacerbated by the plaintiffs' efforts to claim an imminent injury. In attempting to show that injury is imminent, the plaintiffs assert that "there was *already* a large outbreak at Noah's Ark and the surrounding community; hundreds of meatpacking plants have had similar outbreaks, which have universally led to spikes in community spread; [and] these outbreaks continue. . . ." But if that's the case, how are the putative injuries the plaintiffs allege—the effects of disease *in the community*—uniquely attributable to Noah's Ark, and how would enjoining Noah's Ark mitigate those effects?

It would be different were the plaintiffs, say, current employees of Noah's Ark. Then, their risk of COVID-19 might be fairly traceable to their workplace, and injunctive relief in their favor might mediate that risk. But where the alleged injury is to the community at large, the plaintiffs can only speculate as to whether an outbreak of disease in the community would be attributable to

Noah's Ark or some other cause. *Cf. Clapper*, 133 S. Ct. at 1149. And "it must be more than merely speculative that the relief requested would have any effect to redress the harm *to the plaintiff*." *Hall v. Lhaco, Inc.*, 140 F.3d 1190, 1196 (8th Cir. 1998) (emphasis supplied); *accord, e.g., Young Am. Corp. v. Affiliated Computer Servs. (ACS), Inc.*, 424 F.3d 840, 845 (8th Cir. 2005).

The plaintiffs rely on the threat COVID-19 poses to their community . . . but as we've all learned over the past year, there are lots of ways for COVID-19 to spread in a community, through other meat processing facilities (as the plaintiffs point out), other employers, and other gathering places. The risks faced by these plaintiffs as members of the community come from an incalculable number of sources, and while the plaintiffs are certainly entitled to be concerned, the Court finds it difficult to see a limiting principle if the Court's authority can be invoked by these plaintiffs against this defendant just because some of the plaintiffs *used to* work there. Nor can the Court be in any way assured that if it afforded the relief requested, the risk to the plaintiffs would be meaningfully abated. *See Warth v. Seldin*, 95 S. Ct. 2197, 2208 (1975).

The plaintiffs specifically rely on Dr. Leonard's situation as establishing Art. III standing, because they say his medical practice could suffer the consequences of a COVID-19 outbreak. *See* filing 40 at 17. In that regard, the Supreme Court's decision in *Diamond v. Charles* is instructive. 106 S. Ct. 1697, 1705 (1986). The doctor in *Diamond* sought to intervene in a federal lawsuit to defend an Illinois abortion law, contending that because he was a pediatrician, enforcement of a law that reduced abortion would mean more live births and more patients. *Id.* at 1705. But the Supreme Court found that his asserted standing rested on speculation, as opposed to the situation of physicians against whom enforcement of the law was directed, or whose actual fees were limited by the challenged law. *Id.* The Supreme Court explained that the

intervenor had "an interest, but no direct stake" in the process, and his "abstract concern" did not suffice for purposes of Art. III. *Id*. at 1706.

The Court finds the same to be true here: Dr. Leonard's claim to standing rests on the hypothetical and speculative effects on his practice of a sequence of events that is itself speculative. And the Court again struggles to see a limiting principle if the Court's authority can be invoked by a doctor against any conduct that poses a threat to the health of his or her patients.

Beyond that, even if the Court could find Art. III standing, the plaintiffs' claims would run squarely into the doctrine of prudential standing. It's also a fundamental restriction on the Court's authority that in the ordinary course, a litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties. *Hollingsworth v. Perry*, 133 S. Ct. 2652, 2663 (2013); *Glickert*, 792 F.3d 881; *Hodak v. City of St. Peters*, 535 F.3d 899, 904 (8th Cir. 2008). So-called "prudential standing," which is separate from Art. III standing, embodies judicially self-imposed limits on the exercise of federal jurisdiction. *United States v. Windsor*, 133 S. Ct. 2675, 2685 (2013); *Hodak*, 535 F.3d 903-04; *see Lucas v. Jerusalem Cafe, LLC*, 721 F.3d 927, 938 (8th Cir. 2013).

In this case, of course, the people directly put at risk by Noah's Ark's alleged misconduct are the people who work there now, and the plaintiffs cannot assert their claims for them. The "emotional distress and fear" the plaintiffs say they would suffer if their former co-workers caught COVID-19, *see* filing 40 at 18, won't suffice to allow them to sue in their own right.

The plaintiffs argue that they have third-party standing to assert claims belonging to current employees of Noah's Ark, because they have close relationships to people who still work there and those people, the plaintiffs say, face retaliation if they sue in their own right. *See* filing 40 at 19. There is an

exception to prudential standing where the party asserting the right has a close relationship with the person who possesses the right and there is a hindrance to the possessor's ability to protect his own interests. *Sessions v. Morales-Santana,* 137 S. Ct. 1678, 1689 (2017). But only in exceptional cases may a party have standing to assert the rights of another. *Ben Oehrleins & Sons & Daughter, Inc. v. Hennepin Cty.*, 115 F.3d 1372, 1378-79 (8th Cir. 1997). Specifically, the Supreme Court has been willing to lessen the prudential limitations on standing within the context of the First Amendment. *Kowalski v. Tesmer,* 125 S. Ct. 564, 567 (2004). And the Supreme Court has allowed third-party standing when enforcement of a challenged regulation against the litigant would indirectly violate the rights of third parties. *Id.* at 568. But outside of those examples, the Supreme Court has not looked favorably upon third-party standing. *Id.*

In this case, the plaintiffs offer little to explain why third-party standing is appropriate when, by their own allegations, both plant employees and local, state, and federal officials would be highly motivated to regulate and monitor the conduct the plaintiffs allege. *See Thole v. U. S. Bank N.A,* 140 S. Ct. 1615, 1621 (2020). The former-employee plaintiffs have been proceeding in this case pseudonymously because of possible retaliation, but the plaintiffs haven't articulated any reason why *current* employees couldn't do the same.[3] And of course, third-party standing exists as an exception to *prudential* standing requirements. *See Kowalski,* 125 S. Ct. at 567. Even in the rare instances when litigants may assert the interests of others, the litigants themselves still must have suffered an injury in fact, thus giving them a sufficiently concrete interest

---

[3] Were the current employees' union to attempt to assert the rights of its members, that would present an interesting question of associational standing. *See, e.g., Higgins Elec., Inc. v. O'Fallon Fire Prot. Dist.*, 813 F.3d 1124, 1128 (8th Cir. 2016). But the union's not here either.

in the outcome of the issue in dispute. *Hollingworth*, 133 S. Ct. at 2663. As explained above, the plaintiffs in this case have not.

## CONCLUSION

For the reasons explained above, the Court finds that the plaintiffs lack both Art. III and prudential standing. Accordingly,

IT IS ORDERED:

1. Noah's Ark's motion to dismiss (filing 50) is granted.

2. The plaintiffs' complaint is dismissed.

3. All other pending motions are denied as moot, and all pending objections are overruled as moot.

4. A separate judgment will be entered.

Dated this 1st day of March, 2021.

BY THE COURT:

John M. Gerrard
Chief United States District Judge